ROBERT A. BARNES *et al. v.* LOUIS GOTTSCHALK, Judge, etc., *et al.*

November 27, 1876.

1. Until the inferior court has been asked in some form, and without avail, to refrain from proceeding with the trial of a cause, or to dismiss the same, a superior court will not entertain an application for a writ of prohibition.

2. An officer can be required to certify to such facts only as are within his official knowledge.

3. Section 21 of article 9 of the Constitution, providing for the filing of a certificate by the mayor of the city of St. Louis and the presiding justice of the County Court of the county of St. Louis, necessarily implies the duty of an examination as to the facts to be certified. A certificate made by the clerk of the County Court of the facts required by that section would be a nullity.

4. Until the result of an election has been certified by the proper officer there can arise no case of a contested election.

5. Where the question before the superior court is one of rightful or usurped jurisdiction about to be assumed by the inferior court, it cannot be determined by the allegations in the pleadings, but the proposed action of the court is the test.

6. *Mandamus* will lie to compel the proper officer to certify the result of an election, but not to accomplish the purposes of a contested election.

7. *Mandamus* will not be refused because there might, under some other remedy, be an incidental determination of the right asserted, but followed by a judgment incapable of enforcing such right.

*Per* BAKEWELL, J., dissenting. 1. The certificate of the clerk of the County Court of the facts required to be certified, by section 21, article 9, of the Constitution, was *prima facie* evidence of the result of the election, and rendered an examination of the ballots and poll-books, and a certificate by the mayor and presiding justice, unnecessary.

2. *Mandamus* will not lie to determine the result of a contested election, under cover of an application to compel an officer to certify the result of an election.

3. In a *mandamus* proceeding, where issues of fact are to be tried, the trial is by jury; the evidence is *viva voce*, and it must fully support the issues raised, and none other.

4. In a *mandamus* proceeding the jurisdiction of the court to command the execution of the particular act or duty made the subject-matter of the writ must be clear.

5. In a *mandamus* proceeding to compel certain officers to certify the result of

an election, the court has no power to appoint other persons commissioners to examine the ballots and poll-books, and report thereon, and such officers are in no way bound by such report when made.

6. Parties making an application for a writ of prohibition cannot be affected by any action of the respondents in the proceeding sought to be prohibited, where such applicants were not parties to that proceeding.

7. Prohibition will lie to arrest proceedings where the court, though rightfully entertaining jurisdiction, has exceeded its legitimate powers.

PETITION for prohibition.

*Writ refused.*

*Alex. J. P. Garesché,* for relators, cited : Sparks *v.* City of St. Louis, 10 Mo. 120 ; The State *ex rel. v.* Auditor, 36 Mo. 73 ; Beck *v.* Jackson, 43 Mo. 119 ; The State *ex rel. v.* Rodman, 43 Mo. 261 ; The State *ex rel. v.* Draper, 48 Mo. 217 ; The State *ex rel. v.* Steers, 44 Mo. 225 ; Bowen *v.* Hixon, 45 Mo. 345 ; The People *v.* Vail, 20 Wend. 14 ; Hadley *v.* Mayor, 33 N. Y. 605 ; Morgan *v.* Quackenbush, 22 Barb. 79 ; The People *v.* Leaman, 5 Denio, 412 ; The State *v.* Deliessime, 1 McCord, 65 ; The State *ex rel. v.* Church, 15 Minn. 459 ; Hulsemann *v.* Rems, 41 Penn. 401 ; The State *ex rel. v.* Coffee, 59 Mo. 67 ; The State *ex rel. v.* McReynolds, 61 Mo. 212 ; The State *ex rel. v.* Henkins, 43 Mo. 261 ; The State *v.* Ensworth, 44 Mo. 349 ; The State *ex rel. v.* Harrison, 38 Mo. 543 ; Sweet *v.* Herbert, 51 Barb. 312 ; Taylor *v.* Taylor, 10 Minn. 115 ; 2 Pars. Eq. Cas. 562 ; Shorrett's Case, 517 ; Carpenter's Case, 540 ; The State *v.* Vail, 53 Mo. 97 ; The State *v.* Townsley, 56 Mo. 107 ; 3 Bla. Com., sec. 122, p. 84 ; Quimbo Appo *v.* The People, 20 N. Y. 531 ; Darby *v.* Cozens, 1 Durnf. & E. 555 ; Leaman *v.* Souttz, 3 Durnf. & E. 3 ; Board of Comrs. *v.* Spitter, Barn. & Ald. 240 ; Thomas *v.* Mead, 36 Mo. 232 ; Howard *v.* Pierce, 38 Mo. 301 ; The State *ex rel. v.* Clark County Comrs., 41 Mo. 49 ; Vilt *v.* Owens, 42 Mo. 515 ; High on Rem., secs. 771, 781 ; Blaisdell *v.* Pope, 19 Mo. 159.

*Glover & Shepley,* for relators, cited : Clark *v.* McKenzie, 7 Bush, 523 ; The People *v.* Vancleve, 1 Mich. 362 ;

Taylor *v.* Taylor, 10 Minn. 107 ; 20 Wend. 12 ; 4 Seld. 70 ; Calaveras County *v.* Brockway, 30 Cal. 326 ; The State *v.* Judge, 13 Ala. 805 ; The State *v.* Elwood, 12 Wis. 551 ; The State *v.* Saxton, 11 Wis. 27 ; The State *v.* Avery, 14 Wis. 122.

LEWIS, J., delivered the opinion of the court.

The petitioners allege that they are qualified voters, owners of real and personal estate, and tax-payers in the city and county of St. Louis, and, therefore, directly interested in the litigation of a certain cause now pending in the St. Louis Circuit Court, before Hon. Louis Gottschalk, a judge thereof, wherein the State of Missouri, at the relation of Thomas J. Henley and others of the defendants herein, is plaintiff, and Henry Overstolz, mayor of the city of St. Louis, and Chauncy F. Schultz, presiding justice of the St. Louis County Court, are defendants ; that said cause is in the nature of a petition for *mandamus* to compel those officers to certify in duplicate, as provided by section 21, article 9, of the State Constitution, a copy of the Scheme and Charter alleged to have been adopted at an election held for that purpose in pursuance of section 20 of the same article. Petitioners set out at length the contents of the relators' petition for *mandamus*, and the proceedings in the Circuit Court thereupon. It thus appears that an alternative writ of *mandamus* was directed to the mayor and presiding justice ; upon which they made their return, admitting that a certain Scheme and Charter had been framed and submitted to the people of St. Louis County, in the form prescribed by the Constitution, but declaring, in effect, that "whether said Scheme and Charter was duly ratified by a majority of all the qualified voters of the city and county voting at the said election" the respondents had not, nor were they by law required to have, any other or further knowledge than was derived from a certificate and abstract of the votes cast at said election, made by the clerk of the county of St. Louis, under his hand and official seal ;

that from this certificate it appeared that the Scheme and Charter were not ratified by the qualified voters, as alleged, but were, on the contrary, defeated and rejected; that, being so advised through said certificate and abstract, the respondents had refused to certify in duplicate a copy of the Scheme and Charter, as it would have been their duty to do if the same had been adopted. It further appears that an answer to this return was filed by the relators, in which they deny that the Scheme and Charter were defeated at the election, and aver that the contrary is true. They charge numerous errors and irregularities in the holding of the election, and deny the truth of the clerk's certificate. They conclude with a prayer that the mayor and presiding justice be required to "take such steps, by counting the ballots cast at said election or otherwise, as may be necessary to give them full, true, and certain information in regard to the result of said election."

This answer was followed by a reply from the respondents. Referring separately to each charge of error or irregularity at the election precincts, they aver that they have no knowledge or information thereof sufficient to form a belief; nor have they any such knowledge or information as to whether the clerk's certificate is true or untrue in any of its averments.

Upon the pleadings thus framed, the court made an order declaring the issues, and appointing five commissioners to try them. The order proceeds as follows :

" That said commissioners proceed to examine and count said ballots in said election precincts, and report :

"*First.* The number of ballots duly numbered according to law, and of these how many were cast for or against the Scheme and Charter in each of said election precincts.

"*Second.* The number of ballots not numbered according to law, and of these how many of them were cast for or against the Scheme and Charter in each of said precincts.

"*Third.* Any other fact relative to the true result of the

election, which may appear from the inspection, examination, and count of the ballots.

"And it is further ordered that said commissioners may, in case of doubt or difference of opinion, report any fact to this court and pray for further instructions."

At this point the petitioners appear before us, and, averring that the proceedings of the Circuit Court are in assumption of a jurisdiction and of powers not vested in it by law, ask that we issue a writ of prohibition to stop them.

The first obstacle in the way of this application may be considered a purely technical one ; but a long and unwavering course of judicial decisions has, in the present aspect of the record, made it insurmountable. It nowhere appears that the Circuit Court was asked, in any form, to refrain from proceeding, or to dismiss the case, for want of jurisdiction. The rule is inflexible that, until this is done without avail in the inferior court, an application for prohibition will never be entertained by a court of supervisory authority. *Edmundson* v. *Walker*, Carth. 166 ; *Bouton* v. *Hursler*, 1 Barn. K. B. 71 ; Ex parte *McMeechen*, 12 Ark. 70 ; Ex parte *City of Little Rock*, 26 Ark. 52. This consideration is, of itself, sufficiently imperative to deny the writ. But, because of the great public importance of the matters involved in the *mandamus* proceeding, and of the influence on future steps therein which may proceed from the views of this court, matured under an able and thorough discussion by opposing counsel, we deem it not improper to consider the real merits of the case as if no technical barrier had appeared.

It is claimed by petitioners that the Circuit Court had no jurisdiction to grant a *mandamus* in the case presented, or to make the order above shown. Our views upon their chief grounds of objection will be better understood after a statement of the interpretation we attach to the pro-

visions of the general election law and of the Constitution, as applied to the late Scheme and Charter election.

Section 25, on page 569, of Wagner's Statutes, is as follows:

"The clerk of each County Court shall, within eight days after the close of each election, take to his assistance two justices of the peace of his county, or two justices of the County Court, and examine and cast up the votes given to each candidate, and give to those having the highest number of votes a certificate of election."

This is the only provision which confers on the clerk of the County Court authority to certify the result of any election. It cannot be literally applied to that for the Scheme and Charter; since no votes were there given to any candidate, no candidate received the " highest number of votes," nor was there any one to whom the clerk could give a certificate of election. Whence, then, came the clerk's authority to issue a " certificate and abstract " of the result, and what gave to that paper an official significance for any purpose? It is suggested, with the support of unquestioned authority, that, whenever there is an election for a matter of merely local, and not of personal, application — as, for the location or removal of a county seat, etc. — under a special law which makes no provision for the manner of holding it, the general law regulating elections by the same body of voters will control. But no such rule can apply to any particular feature for which the special law makes a clear provision. Especially must this be so when the special is a part of the organic law.

The State Constitution, article 9, section 20, after providing for the election of a board of freeholders, and their formation of a Scheme of separation and a Charter for the city of St. Louis, proceeds as follows:

" Within thirty days thereafter the City Council and County Court shall submit such Scheme to the qualified vot-

ers of the whole county, and such Charter to the qualified voters of the city so enlarged, at an election to be held not less than twenty nor more than thirty days after the order therefor; and, if a majority of such qualified voters voting at such election shall ratify such Scheme and Charter, then such Scheme shall become the organic law of the county and city, and such Charter the organic law of the city; and, at the end of sixty days thereafter, shall take the place of and supersede the Charter of St. Louis and all amendments thereof, and all special laws relating to St. Louis County inconsistent with such Scheme.

"Sec. 21. A copy of such Scheme and Charter, with a certificate thereto appended, signed by the mayor and authenticated by the seal of the city, and also signed by the presiding justice of the County Court and authenticated by the seal of the county, setting forth the submission of such Scheme and Charter to the qualified voters of such county and city, and its ratification by them, shall be made in duplicate, one of which shall be deposited in the office of the secretary of state, and the other, after being recorded in the office of the recorder of deeds of St. Louis County, shall be deposited among the archives of the city, and thereafter all courts shall take judicial notice thereof."

If these provisions charge upon any person or persons, other than the clerk of the County Court, the duty of ascertaining and certifying the result of the election, then the certificate given by the clerk is, for any and all purposes, a nullity.

An officer can certify to nothing that he does not know. An official certificate implies official knowledge. The officer attests his own knowledge, and not that of another. The clerk of a court of record, in certifying a judgment, does not, as the petitioners' learned counsel truly say, certify to its validity, although he may have the judge's official declaration to that effect. He certifies only that it appears upon the record of the court. That fact is within

his official knowledge, because the record itself is before him. The recorder of deeds does not certify to the operation or effect of a deed, or to the identity of the property conveyed; because of these things he has no official knowledge. He knows, however, that the instrument appears in certain words and figures upon his books, and he can certify to nothing more. It may be stated, as a general rule, that the law neither requires nor permits an officer to certify what is known to another, but not by himself. Hence the appropriate formula: " as appears by the records in my office." The officer attests the existence of the record. The record attests the fact recorded. An officer may be authorized to act upon a certain species of evidence as conclusive, and, upon such testimony, to certify the fact established. But in all such cases it must distinctly appear, both that the evidence has been received and that the law declares it sufficient.

Applying these principles, can it be assumed that the Constitution requires the mayor and presiding justice to give their solemn attestation of a fact whereof they know nothing except as they may be informed by the clerk of the County Court? This officer is not once mentioned in that connection. Why this array of high authentications by the chief officers of the city and county, supported by the corporate seals of their respective municipal subdivisions, if all is only to show, not what these prominent functionaries are able to assert, but what the clerk of one of the subdivisions has told them? Surely it would be more satisfactory if the clerk were to convey the result of his examination, for preservation in the public archives, directly to the State authorities, rather than through other persons who can only report, at second-hand, upon the speculative accuracy of his conclusions.

It may be asked, Why should not the clerk's examination and certificate be sufficient for the results of this election, as well as for those of general elections for State and

county officers? The answer is that the law does not make them so. The statute distinctly intrusts him, in the case of general elections, with authority to certify results. It naturally couples with this authority the duty of personal examination, upon which to found his certificate. But the Constitution, in providing for the Scheme and Charter election, devolves upon other officers the duty of certifying, which includes, by necessary implication, the duty of preliminary investigation. The clerk is here ignored for every purpose.

The Constitution purposely requires a very high grade of authentication, proceeding from officials of both city and county, for the establishment of a new order of things which is to change their relations with each other and revolutionize in each its system of organic law. But what avails this deliberate care if those officials are to give, at last, only the testimony of the clerk? The clerk may be conceded to be a model of integrity, uprightness, and accuracy. Yet, for this particular purpose, the Constitution demands something more. It demands qualifications, both official and personal, not possible to be comprehended in him. A thousand officials, repeating what the clerk has asseverated, and only because of his asseveration, could not augment the primary testimony, or bring it nearer, by a hair's breadth, to the constitutional standard.

It may be remarked that the Constitution attempts no interference with the manner of holding the required election. So far, then, the general law will control. But, this limit being reached, the Constitution interposes a new method of ascertaining and certifying the result, totally different from that of the general election law, and, therefore, superseding it. It may further be remarked that, by the general law, the ballots are to be counted by the judges at their respective precincts, and the county clerk is authorized to accept their reports of such counts as conclusive evidence upon which, after duly examining and comparing them, he may

certify the general result. But, in the constitutional pro-
vision we are considering, no power is given the designated
officials to accept any inferior grade of testimony upon
which to found their certificate. They must, therefore,
resort to the best evidence of which the nature of the case
will admit. This they can do only by resorting to the bal-
lots themselves.

We conclude that the Constitution plainly imposes on the
mayor of the city and the presiding justice of the County
Court the duty of personally inspecting and counting the
ballots cast, in order that they may certify, in due form,
the adoption of the Scheme and Charter at the election
held for that purpose, if such shall be the result so ascer-
tained. All this being done, the matter will then first be
in shape for a possible contest of the election, by *quo war-
ranto*, information, or otherwise, according to circum-
stances.

Such being our general conclusions, we proceed to con-
sider their influence upon the leading objections raised by
petitioners against the *mandamus* proceeding.

It is insisted that *mandamus* cannot be employed to
accomplish the purposes of a contested election. Granted ;
but here are no such purposes. A contested election can
have no existence until after the result has been declared and
the certificate awarded by the proper ministerial officer.
This, in the present case, has never been done. The pro-
ceeding is not to investigate the truth of a declared result,
but to compel an official declaration of result where none
has been made. Such a process lies precisely within the
legitimate operation of the writ of *mandamus*.

Petitioners still find, however, in the relator's answer to
the respondents' return some of the elements of a con-
tested election. They point to allegations touching the
disqualifications of voters, errors in counting ballots,
refusals to recognize ballots duly cast, etc. But these alle-
gations fall far short of making a contested election case,

when their avowed object is merely to show a necessity for the performance, by the proper officers, of a ministerial act which has been wholly omitted. Moreover, the question before us is one of rightful or usurped jurisdiction about to be assumed by the Circuit Court. This can never be determined by the allegations of fact in a pleading. The test must be applied to the proposed action of the court itself. What the court thus far proposes to do appears from the order already m^de, and herein quoted. This carefully avoids any inquiry into the qualifications of voters, and into many other matters which are inseparable from every case of contested election.

The petitioners refer us to many authorities in support of their proposition that *mandamus* will not lie to obtain a relief which any different legal remedy would afford. Here, again, they assume for the proceeding in the Circuit Court an object foreign to that which it really has in view. Assuming that the purpose is to obtain an adjudication that the Scheme and Charter were adopted, they contend that this could be effected under an information in the nature of *quo warranto* against any person holding an office in violation of the Scheme and Charter; that an issue would be raised therein upon the result of the Scheme and Charter election; that the investigation of the right to the office would thus incidentally determine whether the Scheme and Charter were in fact ratified. But, admitting, for the sake of the argument, that the petitioners rightly assume what is sought for in the *mandamus* proceeding, two answers present themselves, either of which appears to be conclusive: First, the Constitution provides that "all officers now or hereafter elected or appointed * * * shall hold office during their official terms, and until their successors shall be duly elected and qualified." Art. 14, sec. 5. Now, as no officer is yet "elected or appointed and qualified," under the Scheme and Charter, and none is likely to be until after a proper attestation of its ratification,

the present incumbents would have, in this fact, a conclusive defense against the *quo warranto*, without any issue upon the result of the Scheme and Charter election at all. Such an issue would, under the circumstances, be immaterial and inadmissible. Second, *mandamus* is not to be refused because, under some other remedy, there might be an incidental determination as to the right asserted, but followed by a judgment incapable of enforcing it. If a judgment upon *quo-warranto* information were rendered on the distinct ground that the Scheme and Charter were ratified, it would oust the usurping defendant, but would accomplish nothing more. The Scheme and Charter would still have to be put in operation by other means. Petitioners refer us to cases wherein the objective point was to obtain possession of an office. The judgment upon *quo warranto* was precisely adapted to that result, and hence *mandamus* would not lie.

Howsoever it may be imagined that the object of the *mandamus* proceeding is to obtain a judgment declaring the Scheme and Charter to have been ratified by the people, there is certainly no intimation in the record that the Circuit Court proposes to render such a judgment. The theory of the proceeding appears to be one of utter indifference to the accomplished fact, whether of ratification or rejection of the Scheme and Charter. It asserts, in effect, that the relators have a right to know, from authorized official sources, under what form of city or county government their rights as citizens are to be protected; that the officers whose duty it was to determine from means within their control, and to declare in constitutional form the express will of the people, have wholly failed and neglected so to do. They demand that those officers be directed to perform their duty, whatever result may follow the performance. This is our understanding of the case as developed in the petition and exhibits before us. We can perceive no reason why *mandamus* is anything but the proper form of

proceeding, or is beyond the jurisdiction of the Circuit Court for the purposes intended.

It appears that the Circuit Court has considered it necessary, in order to determine the propriety of issuing a peremptory *mandamus,* to have certain issues first tried and reported upon by commissioners. Whether such a course is in harmony with the views expressed in this opinion need not be here discussed. We have only to consider the question of jurisdiction, without reference to the manner of its exercise within lawful bounds. Errors, if any arise, can be reviewed by us only on appeal or writ of error. The writ of prohibition is refused. Judge GANTT concurs; Judge BAKEWELL dissents.

BAKEWELL, J., delivered a dissenting opinion.

The Constitution recently adopted by the people of this State contains a provision for submitting a certain Scheme and Charter to a vote of the people of St. Louis County. It further provides that, if this Scheme and Charter be ratified by the vote of the people of St. Louis County, a copy of such Scheme and Charter, with a certificate thereto appended, signed by the mayor of St. Louis and authenticated by the seal of the city, and also signed by the presiding justice of the County Court, and authenticated by the seal of the county, setting forth the submission of the Scheme and Charter to the qualified voters of the county and city, and its ratification by them, shall be made in duplicate, one copy to be deposited with the secretary of state, the other to be recorded and deposited among the archives of the city.

The Scheme and Charter were, accordingly, on August, 22, 1876, submitted to a vote of the people of the city and county of St. Louis. The county clerk, acting under the election law in force in St. Louis County at the time, canvassed the returns of the judges of said election, and certified the result of this canvass to the County Court. This return, recognized by the general election laws as an

official statement of the result of the election, shows the defeat of the Scheme and Charter.

On October 13, 1876, at the relation of Thomas B. Henly and others, tax-payers and voters residing in the county of St. Louis, an application was made to the Circuit Court of St. Louis County for a writ of *mandamus* directed to Overstolz, mayor of St. Louis, and Schultz, presiding justice of the County Court, commanding them to certify a copy of said Scheme and Charter, and of the ratification of the same, and to examine and count the ballots and inspect the returns, to verify whether said Scheme and Charter had or had not been adopted. This application, amongst other allegations, contained a statement that the Scheme and Charter had been duly and legally adopted at the election held on August 22d, as the law provided.

To the alternative writ, which, in consequence of this application, was directed to them, the mayor and presiding justice made return that the judges of election for their respective districts in said city and county of St. Louis made return of the poll-books, ballot-boxes, and ballots cast at said election, together with certificates of all ballots cast in their respective districts, to the clerk of the County Court, which certificates stated the number of ballots cast for and against said Scheme and Charter; that the clerk thereupon made out a certificate and abstract of the vote, and delivered one duplicate copy thereof to each of respondents (said certificate and abstract are then set out in the return); and it appears thereby, and respondents state, that the Scheme and Charter were not ratified; and whether said Scheme and Charter were ratified by a majority of votes, or whether such ratification will appear on examination of the ballots cast, respondents say that they have not, and are not by law required to have, a further knowledge than thus set forth; and, further, they say that the only means of information or knowledge that respondents are required or allowed by law to act upon are those thus set forth; and that it is not their duty to inspect poll-books,

examine returns of judges, or inspect or count the ballots, or adopt any other or further means of ascertaining the result of the election.

To this return the relators of plaintiff answer that it is not true that the Scheme and Charter were not ratified; that, on the contrary, they received the majority of legal votes at said election; that the certificates and enumeration of the judges of said election, and their poll-books, are untrue; that a number of not legally qualified voters voted against said Scheme, to wit, such a number of voters in such and such precincts; and that many legal voters who voted in favor of the Scheme and Charter are returned as having voted against it, to wit, such and such numbers in such and such precincts. The numbers at each precinct are given in the answer, but the names of the illegal voters are not given, nor any information to identify the illegal voters. The answer further says that the certificate of the county clerk is untrue.

The reply of respondents is to the effect that they have no knowledge or information of any mistake or fraud in said election, and, specifically, as to each allegation of mistake or fraud, that they have no knowledge as to it; that their whole knowledge in the matter is derived from the certificate of the county clerk; and they demand strict proof of these allegations in the answer to the return.

Upon the filing of this reply, the relators of plaintiff moved the court to appoint persons to examine and count the lawful ballots cast at said election, to compare them with the poll-books and report the result; and that for these purposes these persons so appointed should have access to, and be permitted to examine, the poll-books, ballot-boxes, and ballots used in said election and in the custody of the county clerk, and to make return of their proceedings to the court.

Thereupon, on November 15, 1876, the Circuit Court, without any preliminary proof to show any ground to believe

that there had been any mistake or fraud in said election, appointed five commissioners to make the examination, and made an order in the following words:

The court orders that said commissioners "shall first take, subscribe, and file their oaths that they will well and faithfully discharge their duty, and that they will make a true report of their proceedings. And it will be further ordered that the clerk of the County Court shall permit an inspection, counting, and examination of the ballots cast at said election in the different voting precincts mentioned in the petition as being those where the alleged mistakes have occurred, in his presence, during the hours of —— o'clock, A. M., to —— o'clock, P. M., of each day, by said commissioners, as the same has become necessary to be used in evidence in this case now pending in this court; and that said commissioners proceed to examine and count said ballots in said election precincts, and report:

"*First*. The number of ballots duly numbered according to law, and of these how many were cast for or against the Scheme and Charter in each of said election precincts.

"*Second*. The number of ballots not numbered according to law, and of these how many of them were cast for or against the Scheme and Charter in each of said precincts.

"*Third*. Any other fact relative to the true result of the election, which may appear from the inspection, examination, and count of the ballots.

"And it is further ordered that said commissioners may in case of doubt or difference of opinion, report any fact to this court and pray for further instructions.

"And that a copy of this order be duly served on the clerk of the County Court and delivered to said commissioners.

" Let an order according to this be entered."

On the day that this order was made in the Circuit Court, Robert A. Barnes and other tax-payers and voters of St. Louis County filed their petition in the Circuit Court, pray-

ing to be made co-defendants with said Overstolz and
Schultz, which prayer was denied; and thereupon said
Barnes and his co-petitioners make an application to this
court, wherein they set forth all these facts, and aver that
the said election was duly and lawfully held, according to
the provisions of the general election laws of the State, and
that the said Scheme and Charter was defeated by a vote of
the majority of the lawful voters voting at said election,
and that the mayor of the city and presiding judge of the
County Court have no power or authority by law to go
behind the returns or examine the ballots of said election;
that the order made by Louis Gottschalk, the judge of the
Circuit Court, is illegal, and an order which he has no power
or authority to make, and to the damage of petitioners and
the voters of this county; and they ask for a writ of prohi-
bition, directed to said Gottschalk, judge of the Circuit
Court, and to the relators in said application for a *mandamus*,
and to said committee appointed to count the ballots and
inspect the poll-books, restraining each and every one of
them from further proceeding in said matter.

It was long ago remarked, perhaps hypercritically, that
Virgil makes Rhadamanthus first punish criminals, then
hear them, and then compel them to confess. Rhadaman-
thus, however, was a judge in hell, where order is supposed
not to prevail, *ubi nullus ordo, sed sempiternus horror inhab-
itat.* It is not, perhaps, so easy to explain why an applica-
tion is made to the Circuit Court for a writ commanding the
mayor and presiding judge of the County Court first to
certify that a certain Scheme and Charter was adopted, and
then to count ballots and inspect returns to see whether
it is adopted or not. Yet this petition for a writ of pro-
hibition states that that is what is asked by the relators
in their application for a *mandamus.* It also seems incon-
gruous that these same relators should allege that the Con-
stitution imposes a duty of counting these ballots and exam-
ining the poll-books upon Mayor Overstolz and Judge

Schultz alone, and, in the same proceeding in which they allege that these gentlemen, and these gentlemen alone, are the officers named to do this work, ask that a commission of other gentlemen be appointed to do it for them, as a preliminary step to obtaining an order commanding them to do it for themselves.

The application for a *mandamus*, and the action of the Circuit Court thereon, seem irregular in more than one respect. Courts will be astute in seeing to their jurisdiction in applications for *mandamus*, where no appeal lies and no writ of error can be had, and because much mischief might ensue if the court improvidently enjoined the performance of things impossible or improper. It is a prerogative writ, and not a writ of right; and prerogative writs do not issue as of mere course, without showing some probable cause why the extraordinary power of the State is called to the assistance of the relator.

An application for *mandamus* should always be made within reasonable time. In this case it was made two months after the election to which respondents are to be required to certify, and on the eve of a general election which will have been in a great measure futile in this county if the result of the application should show, as the relators claim it will, in their application for the writ, that the Scheme and Charter in question was actually adopted in August last. The application is made so closely upon the heels of the November elections that no order is, or could well be, obtained in the case until those elections are over and the result known.

The trial of issues of fact in a *mandamus* case does not differ from the trial of such issues in a personal action. Formerly, there were no issues of fact in a proceeding for *mandamus*, because the return was conclusive as to facts. But that is now changed, both in England and this country. Still, the trial is by jury, when any issue of fact arises; the evidence is *viva voce*, and it must fully support the issues;

and no issues but those raised — either by *feigned issue*, where that is the practice, or by traverse to the return, as our statute provides — can be tried. How the appointing of a commission to count the ballots can be a trial of an issue as to the validity of an election, where such an issue is raised in a proceeding at law, or how the determination of this issue could tend to inform the court whether a peremptory *mandamus* should go to direct the same count to be made by other parties, alleged by relators to be the only legally constituted officers for that purpose, I cannot see.

It is said that *mandamus* will never be granted to command any person to exercise a jurisdiction which he is not clearly and certainly appointed to, and bound by law to exercise ; nor where obedience to the writ might subject those obeying it to an action. The application in this case was for a rule on two men to inspect poll-books and count a vote. These men were neither judges of election nor clerks of the County Court. No statute, in express terms, gives them any such power. The general statutes, in express terms, impose these duties upon other officers ; and the general election law says (Wag. Stat. 569, sec. 23) : "All elections in the city and county of St. Louis " (not elections of *candidates*, but *all* elections) " shall be conducted, in all respects, as provided by the laws now in force regulating elections in said county." The Constitution provides (art. 9, sec. 21) that the respondents in this *mandamus* proceeding shall certify, over the respective seals of the city and county, to the submission to vote of this Scheme and Charter, and their ratification, if ratified ; but is quite silent as to any change in the general law which makes the certificate of the county clerk *prima-facie* evidence of the result of an election. Whether, in this Scheme and Charter election, are the ballot-boxes to be returned to the county clerk and the vote to be canvassed by him, and his certificate to be made to the County Court, as in other cases of election? or, second, are the ballot-boxes to be returned

to the mayor of the city and the presiding justice of the County Court, the vote to be canvassed by them as by the clerk of the County Court in an ordinary election? or, third, are the ballot-boxes to be returned to the presiding justice and the mayor, and are they, themselves, to count the ballots and compare them with the poll-books, and determine whether the Scheme and Charter have been ratified?—all these theories of the duty of the mayor and presiding judge in the premises are entertained, in view of the language or the silence of the Constitution. Not that all three views are entertained, perhaps, by any one man on any one day; but they were all expressed as being entertained by the various learned counsel who argued before us for and against the writ of prohibition in this case. There is, therefore, some room for hesitation before assuming jurisdiction to order men to perform a judicial function, when perhaps their duties are purely ministerial; and where, if their duties are ministerial, obedience to the writ will be a serious usurpation of power in a matter which affects the most valued right of every free-man, and may lead to very serious consequences.

I apprehend that courts will not so readily entertain an application for *mandamus* in this country as in England, for many reasons. In England it is now entertained with much greater readiness, because the law provides for an appeal or writ of error, and makes provision for bringing in as par-ties defendant any persons having or claiming any interest in the matter of the writ, to appear and show cause against issuing the same; and the courts will thereupon make such rules and orders between the parties as circumstances require. 3 Steph. Com. 684; 1 & 2 Will. IV., ch. 58; 9 Anne, ch. 20; 1 Will. IV., ch. 21.

In the *mandamus* proceeding now under consideration, those interested against the issuing of the writ applied to be made defendants, and their application was, of course, denied; our law making no provision for any such order.

Formerly, *mandamus* would lie to compel performance

of a ministerial duty only; but now it lies to command performance, by any inferior jurisdiction or officer, of any public duty where there is no other adequate specific legal remedy; but the jurisdiction of the court to command the execution of the particular act or duty, the subject-matter of the writ, must be clear. The court, as the general guardian of public rights, will render it the suppletory means of substantial justice in every case where there is no other remedy for a legal right, and will provide as effectually as it can that all official duties are fulfilled whenever the subject-matter is properly within its control. It issues upon the assumption that that which ought to have been done in time past has not been done.

The writ of *mandamus* is, in form, a command in the name of the State, directed to any person, corporation, or inferior court of judicature, requiring them to do some particular thing therein specified which appertains to their office and duty, and which the court issuing the writ has previously determined, or at least supposes, consonant to right and justice. It is a high prerogative writ of an extensive remedial nature, and may in some cases be issued where the injured party has another more tedious method of redress; but, in general, it will not issue unless the injured party has the clearest right to have something done, and has no other specific means of compelling its performance. There must be a clear right; that right must be complete, and not inchoate, and there must be no other adequate remedy; otherwise the writ is denied.

It is alleged by those applying for the writ of prohibition that the attempt is being made to use the remedy of *mandamus* in the Circuit Court for the purpose of having an election contest; the theory of relators in the *mandamus* suit being that the general election law for candidates for office does not apply to an election for a Scheme and Charter, although the Constitution lays down no other regulations for that election, unless the provisions of sections 20, 21,

article 9, be held to appoint a new and different method of canvassing the returns.

It is manifest that the aim of the relators is, by means of a *mandamus*, to draw to the Circuit Court, in that proceeding, jurisdiction of a contested election, in which many of the salutory provisions of the law of contested elections must be wholly disregarded. Why else is the court asked to direct a recount of the ballots and a reëxamination of the poll-books? Why to appoint commissioners for that purpose? And why to direct certain officers to certify the adoption of the Scheme and Charter? If the peremptory *mandamus* goes according to the prayer of the relators, will it not be a judicial determination that the Scheme and Charter have been ratified, in the face of the certificate of the County Court clerk, and the return of the mayor and the presiding justice of the County Court, that they have not received a majority of votes?

Suppose the general election law not to apply to this Scheme and Charter election, and that the true interpretation of the Constitution is that the mayor and the presiding judge of the County Court are to canvass the vote, to examine and count the ballots, and, for that purpose, to receive the ballot-boxes from the election judges and open them, then it seems to me that the Circuit Court has no right to make an order appointing, as it is asked to do, commissioners to perform a duty which the Constitution devolves upon Mayor Overstolz and Judge Schultz. Suppose, on the other hand, that the mayor and presiding justice have a merely ministerial duty to perform in regard to this election, and that the general election law of the State applies as far as may be ; the ballot-boxes were, then, properly returned to the county clerk, his certificate to the County Court was *prima-facie* evidence that the Scheme and Charter were defeated. What right have the relators, then, to a writ of *mandamus* commanding Overstolz and Schultz to do what they were only to do in the event that

the Scheme and Charter were ratified? The relators say they will establish this right in the very proceeding which we are asked to prohibit; and they ask the Circuit Court to allow them to contest the election on the application for a *mandamus* for the purpose of establishing their right to have the writ. I think there must be a clear duty, plainly incumbent upon those upon whom the writ is to be served, at the time the application is made, or the writ should be denied; and I do not believe that an election contest in this State can be conducted under cover of a traverse of a return to a *mandamus* served upon one whose alleged duty it is to canvass the votes or the returns.

The proceedings in an election contest are not to be *ex parte*. But, if an election contest could be carried on under cover of an application for a *mandamus*, the proceedings are *ex parte*, and the commissioners to count the votes and examine the ballots and poll-books are appointed at the suggestion of the relators, who claim in their petition that the Scheme and Charter is ratified. Those voters who desire the defeat of the Scheme and Charter cannot, nor can any of them, interplead to be made parties, whatever interest they may have in the result of the proceedings. Issues can be made only between the party to whom the writ is directed and the party suing out the writ; and neither the parties nor the court can transform a return to a *mandamus* into a bill of interpleader.

It is my own opinion that the provisions of the general election law of the State govern this election so far as they can be made to apply. Otherwise, it is hard to see how there could be any legal election at all. It would seem that we must go to the general law, in the absence of any other provision, since that law alone establishes the election precincts and provides for judges of election, poll-books, and the manner of making the election returns. It seems that the clerk of the County Court, in this as in other elections, was the proper person to canvass the votes, that it was his

duty to certify the result to the County Court, and that his certificate was *prima-facie* evidence of the result; and those against whom this writ was directed having answered that the county clerk had certified the Scheme and Charter voted down at the election, and their duty being purely ministerial, that ought to be an end of the proceedings.

If it should be granted, then, that the Circuit Court, in the exercise of its broad discretion in such matters, rightly entertained jurisdiction of this application for a *mandamus*, still, if it exceeded its powers by the order which it has made in the case, this would not be a mere error or irregularity, against the consequences of which no relief could be obtained except by appeal or writ of error.

I cannot see that the Circuit Court has in this proceeding any right whatever to appoint commissioners to open the ballot-boxes, or any of them, or to canvass the vote; and I do not believe that the mayor and presiding justice of the County Court are bound in law to give any credence whatever to any report made by such commissioners; whereas, on the theory that they are not themselves the sole canvassers of this vote, the mayor and presiding justice are bound to accept the result as embodied in the report of the county clerk as true upon its face.

The matter of determining the validity of an election is a judicial function, to be passed on by a tribunal competent to make adjudication where the parties interested may be heard. *The State* ex rel. v. *Vail*, 53 Mo. 112. Whatever the remedy in this case may be, it is not by *mandamus* against ministerial officers named in the Constitution; and, a return to the alternative writ having been made, by which it appears that the relators of plaintiff have not a clear right to a peremptory order against the respondents commanding them to certify a copy of the Scheme and Charter, as provided in case of their ratification, I think the Circuit Court should not be allowed to appoint commissioners to inspect ballots and poll-books, and that it exceeds its powers when

it attempts to do so. " In cases of contested elections, the ballots cast may be counted, compared with the list of voters, and examined under such safeguards and regulations as may be prescribed by law." Const., art. 8, sec. 3. But an election contest cannot be inaugurated in this State by means of an application for a *mandamus* upon a returning officer to certify the adoption, by popular vote, of a measure submitted to the people. The Circuit Court has no right to authorize any inspection of ballots, except as provided by law.

It is said, however, that this court cannot interfere, because the question of jurisdiction was not raised below. It is true that no plea to the jurisdiction was verified and tendered in person during the sitting of the court below, and refused ; and this might be fatal to an application for a writ of prohibition made by the respondents in the *mandamus* proceeding. But this application is made by persons who were not, and could not by possibility become, parties to that proceeding. If they have any rights in the matter, and could be heard at all, under any circumstances, to apply for a writ of prohibition against the issuing of the peremptory writ, or of any order in this *mandamus* case, I do not think that they can be injuriously affected by the neglect or refusal of respondents below to plead to the jurisdiction of the court.

No personal interest in the proceedings sought to be prohibited need be shown by the relator or petitioner, and the writ of prohibition may be granted on the application of a stranger to the record ; because, when an inferior court proceeds in excess of its lawful jurisdiction, it is chargeable with a contempt of the sovereign power, the people of the State in their political capacity, as well as with a grievance to the party injured.

It is of vital importance to the administration of justice that every judicial tribunal should be confined strictly to the exercise of its legal powers. Where the inferior court

has jurisdiction of the subject-matter in controversy, a mistaken exercise of its acknowledged powers will not justify a resort to the extraordinary remedy of prohibition; but the province of the writ is not confined to cases where the subordinate court is absolutely devoid of jurisdiction, but is extended to cases where the court, though rightfully entertaining jurisdiction of the subject-matter in controversy, has exceeded its legitimate powers. Though the parties and subject-matter be within the jurisdiction of the inferior court, yet if, in handling matters clearly within its cognizance, it transgresses the bounds prescribed by law, a prohibition will be awarded. If the injured party, in such cases, were without remedy, it would be an impropriety which no government ought to endure. 3 Bla. Com. 112. Lord Ellenborough said, in *Gapper* v. *Gould*, 5 East, 365, "we cannot feel ourselves warranted in holding that the grounds of granting prohibitions are so narrow and limited as to be confined solely to cases of excess of jurisdiction." This language is adopted by the Court of Appeals of South Carolina, in *The State* v. *Ridgell*, 2 Bailey, 560; and in that case the superior tribunal interfered after judgment, the case being an illegal sentence to an excessive punishment inflicted on a slave in a case of which the lower court had jurisdiction. And in New York it is held that prohibition lies to prevent the exercise of unauthorized power in a cause of which the subordinate tribunal has jurisdiction, no less than when the entire cause is without its jurisdiction. *Quimbo Appo* v. *The People*, 20 N. Y. 542. Judge Selden, who delivered the opinion of the court, after citing many English cases in support of that proposition, says: "The writ was never governed by any narrow, technical rules, but was resorted to as a convenient mode of exercising a wholesome control over inferior tribunals. The scope of the remedy ought not to be abridged; it is far better to prevent the exercise of an unauthorized power than to be driven to the necessity of correcting the error after it is committed."

The error of an illegal handling of ballots and scrutinizing of poll-books by persons who have no warrant of law to do these things is one that is a grave public mischief, as well as a wrong to the individual relators here. I do not see how the error is to be corrected at all, if it is permitted to take place. I think that the relators were entitl d to the remedy thus asked, and that the writ of prohibition should have gone against the judge of the Circuit Court.