# O'LAUGHLIN, Appellant, v. CITY OF KIRKWOOD et al., Respondents.

## St. Louis Court of Appeals, May 17, 1904.

1. **LOCAL OPTION: Special Election: Secret Ballot.** In a special election, held under section 3028, Revised Statutes 1899, to determine whether liquors should be sold in a city, where the judges and clerks of election notified the voters that the use of ballots other than those furnished by the city clerk would probably be illegal, but did not refuse to receive such ballots, and where sufficient ballots were furnished by the clerk in both forms, for and against the sale of intoxicating liquors, alike in color, size and shape, and each voter was permitted to take one of each form and vote the one he desired, the secrecy of the ballot was not violated.

2. **ELECTION CONTEST: Irregular and Illegal Election.** In order to annul the result of an election, it must be shown that some mandatory statute was violated or that the election was conducted in such an irregular manner that the true sentiment of the voters was not expressed by it or that it was impossible to know whether the true sentiment was expressed.

3. **LOCAL OPTION: Special Election: Fixing Polling Places and Appointing Judges: General and Special Ordinance.** Where a general ordinance of a city providing that polling places should be fixed and judges and clerks be appointed two weeks before a general election, a special ordinance, providing for the fixing of polling places and appointment of judges and clerks in a special local option election one week before the election, was not invalid. The appointment of judges one week before the election instead of two weeks would have no bearing on the result of the election. The designation of polling places one week before the election was sufficient, where the vote was unusually large, showing that the citizens knew where to vote and it was not contended that the voters were misled as to the polling places.

4. **Elections: Returns: Refusal of Officer to Certify.** Where there was no question against the integrity of the poll books, or about the honesty of the election, and the vote reached the hands of the canvassing officers, the failure of the precinct election offi-

cers to certify the returns did not justify rejecting the vote of the precinct; the court may gather the true result by looking behind a defective return.

5. **LOCAL OPTION: Special Election: Election Called by Order.** Where a petition for a special local option election was sufficient to justify the act of a city council, it could call the election by order of the council as well as by ordinance.

Appeal from St. Louis Circuit Court.—*Hon. J. W. Mc-Elhinney,* Judge.

AFFIRMED.

*Zach J. Mitchell* and *F. A. Heidorn* for appellants.

STATEMENT.

A lucid statement of the facts of this case and the propositions of law which ought to control its decision is contained in the memorandum prepared and filed by the learned circuit judge who tried it. We will therefore copy that memorandum:

"1. It is conceded that a proper petition was presented to the board of aldermen of the city of Kirkwood under section 3028 of the Missouri statutes for an election to determine whether or not spirituous or intoxicating liquors shall be sold within the limits of said city. Upon this petition the said board on the eighth day of May, 1903, made and entered in the record of its proceedings an order as follows: 'The matter of local option petition was taken up and on motion a special election was ordered to be held on the thirteenth day of June, to vote on the question of local option and the clerk was instructed to publish the necessary legal notices.' There was no other or further order or resolution, or any bill or ordinance directing such election.

"2. In pursuance of such order the city clerk published a notice signed by himself, that such special election would be held on the thirteenth day of June, 1903, in pursuance to article 3, chapter 22 of the Revised

Statutes of 1899 of the State of Missouri, to determine whether or not spirituous or intoxicating liquors shall be sold within the limits of the city of Kirkwood, Missouri (a copy of which said notice is in evidence). This notice was published in the 'Weekly Courier,' a newspaper published in the said city of Kirkwood and St. Louis county, Missouri, for four consecutive weeks, the last insertion being on the sixth day of June, 1903.

"3. Since February 19, 1900, there has been in force in said city an ordinance entitled 'An ordinance relating to general city elections.' This ordinance contains the following (among other) provisions:

"Sec. 4. (In substance.) At least two weeks before an election, the board of aldermen shall by ordinance, or otherwise, fix the place of holding the election, and appoint four judges of election for each ward.

"Sec. 5. (In substance.) The legal voters assembled at the opening of the polls may appoint a judge or judges to act in the place of those failing to appear.

"Sec. 7. (In substance.) Four clerks of election shall be appointed at the same time and in the same manner.

"Sec. 12. The judge to whom any ticket shall be delivered shall, upon receipt thereof, pronounce in an audible voice the name of the voter; and if the judges shall be satisfied that the person offering to vote is a legal voter, his ticket shall be numbered and placed in the ballotbox without inspecting the names written or printed thereon, or permitting any other person or persons to do so; and the clerks of election shall enter the names of voters and the number of the ballots in the order in which they were received in the pollbooks; and no ballot not so numbered shall be counted. At the close of the polls the pollbooks shall be signed by the judges and attested by the clerks, and after the names therein contained shall be counted, as provided, the number shall be set down at the foot of the pollbooks, in the manner provided in the form of the pollbooks.

"Sec. 13. At the close of each election the judges shall transmit one of their pollbooks to the city clerk within two days thereafter; if the pollbooks be not returned in the time provided, the city clerk shall have power to send the marshal or a messenger for said books; the other pollbook shall be retained in the possession of the judges of election—open to the inspection of all persons. The city clerk shall, within two days thereafter, take to his assistance one member of the board of aldermen from each ward, and examine the pollbooks and ascertain therefrom the votes given to each candidate, and as soon thereafter as practicable, give to those having the highest number of votes, commissions under the seal of the city, signed by the mayor, and designating their respective offices; and he shall, in examining the returns, do it publicly, in the police court room of this city, first giving notice of the same by public proclamation at the door of the court room.

"Sec. 16. (In substance.) The city clerk shall deliver a copy of Ordinance No. 43 to one of the judges in each ward at least one day previous to the election.

"4. An ordinance was passed by said board of aldermen, June 6, 1903, being Ordinance No. 211, designating the polling places for said election, being one in each of the four wards of said city, and naming four judges and four clerks of election for each polling place. This was the only act or proceeding of said board designating such polling places, judges and clerks.

"5. The city clerk failed to notify the judges and clerks designated, three days before the day of election, although required by section 9 of said ordinance to so notify them. It is not shown that they did not have notice of their appointment, or that failure of any of them to attend resulted in the selection of any improper person for those positions. This failure of the clerk was

not specified as a ground of contest in either of the notices.

"6.    The city clerk failed to deliver a copy of Ordinance No. 43 to any judge of election one day previous to the election; but did supply the judges of election at each polling place with one copy thereof, with the poll-books and other papers necessary for holding said election, at or shortly before the time of opening the polls at each polling place.

"7.    On June 6, 1903, the board of aldermen made and caused to be entered in the record of their proceedings the following order: 'The clerk was instructed to procure 1,500 ballots as provided by law for the election.'

"8.    The said special election was held on the thirteenth of June, 1903, during the hours required by law and at the polling places designated in said Ordinance No. 211; and was conducted according to section 12 of said Ordinance No. 43, and in the manner required for holding elections by article I, of chapter 60, of the Revised Statutes of Missouri, of 1889, and section 3, Laws of 1895, page 67, as amended by Laws of 1899, page 92, except in so far (if at all) as the following facts, or any of them, may show to the contrary: In the first ward, three of the judges and two of the clerks designated by the board failed to serve and the qualified voters present at the opening of the polls elected others to take their places, and they served; so that four judges and four clerks served as such at the polling place in said ward.    In the second ward all the appointed judges and clerks served.    In the third ward all the appointed judges and clerks served.    In the fourth ward, three of the judges and two of the clerks appointed by the board served, but the others failed, and the qualified voters present at the opening of the polls, elected others in their places, who did serve; so that four judges and four clerks served as such at the polling place in said ward.    The selection of judges and clerks was such that

one-half of each at each poll were upon one side and one-half upon the opposite side of the question voted upon at said election, and so far as appears, the judges and clerks who conducted the election remained so evenly divided during the election.

"The city clerk furnished, with the polling books, before the opening of the election, tickets for use at the election, all being upon white paper, of uniform size, about three or four inches long and about two and one-half or three inches wide, with the printed matter in small capital letters printed upon one side of and nearly in the center of each ticket, one-half of said tickets having printed on the same words: 'For the Sale of Intoxicating Liquors,' and the other one-half of the same the words: 'Against the Sale of Intoxicating Liquors.' Four hundred of such tickets 'for the sale of intoxicating liquors,' and four hundred thereof 'against the sale of intoxicating liquors,' were furnished to the judges of election at each voting place, and the same were used by all the judges in conducting said election. At each poll said tickets were placed in similar separate piles, side by side, about three or four to eight or ten inches apart, upon the table in front of the receiving judges, with the printed sides of the tickets up and exposed to view, so that the nature of each ticket might be known by those present from the pile in which it was and from which it might be taken. Each voter was, except as hereinafter stated, required to take a ticket from one or the other of said piles and use the same as his ballot. But he was permitted, if he saw fit, to take one ticket from each of said piles, and to use one of the same for his ballot and retain the other, or do as he saw fit with the same. Said ballots as they were voted were folded and handed to the receiving judges and were by them numbered consecutively as received and placed in the ballotboxes, the name of the voter being publicly announced in the hearing of those present. Said ballots furnished by the city clerk were not permitted by the

judges of election to be taken out of the voting places for distribution, or otherwise taken or used than as above stated. Before the beginning of said election, about one thousand other tickets for use at this election were printed by one Michael O'Donnell and about one hundred of them distributed in each ward, which tickets for convenience are designated as 'outside tickets.' Said tickets were printed on paper of nearly the same shade of color, and same size and shape as said tickets furnished by the said city clerk, being slightly longer and narrower, and a little darker in shade. The letters and printed matter upon said tickets were like those on the said tickets furnished by the city clerk, except a slight difference in the letter 'Q' in the word 'liquors.' Such outside tickets could be distinguished from those furnished by the city clerk only by close comparison.

"About 9 o'clock in the morning, on the day of said election, the judges and clerks, in opening the ballot-boxes and making count of the votes then cast, first discovered the use of some of the outside tickets as ballots, and found some of the same used as ballots in the vote cast. Disputes arose among the judges in the different polls among themselves and with the voters. The city clerk was called upon for advice and, he, after consulting with other counsel, the city attorney being absent from the city, finally in about an hour, advised that the 'outside' tickets were probably illegal, but that they could not be inspected when offered and, therefore, must be received, if offered by voters, but should be strung upon separate strings from the other ballots and the judges in counting up and certifying the result of the election, should determine whether these ballots upon 'outside' tickets should be received and counted or regarded as illegal. Thereafter, from about 10 o'clock or 11 o'clock in the morning, it was announced by the judges at each votiing place that the 'outside' tickets would be received, but might be rejected as illegal in

counting up the vote.   The result was that after this first opening and count of the ballots, at from nine to ten o'clock in the forenoon, only one or two of these 'outside'-tickets were received as ballots, and the other voters offering to vote that kind of ticket voted the tickets furnished by said city clerk or refused to vote any ticket at said election.   A report of this action of the judges in regard to said 'outside' ticket was soon circulated about the city so that it became generally understood that the judges of the election were advising against the use of 'outside' tickets, and would pobably reject them as illegal in the count.   There is no evidence that any 'outside' ticket voted was against the sale of intoxicating liqours; and all of the same are found to have been for such sale.

"The ballots cast at such election were as follows:

FOR THE SALE OF INTOXICATING LIQUORS:

Upon tickets furnished by the city clerk:.

First ward ..... ... ... ... . 23
Second ward .... ... ... ..... 88
Third ward ....................126
Fourth ward .... .... .... ... 70
                             ————
                              307

"Upon the so-called 'outside' tickets:

First ward .................... .. 2
Second ward .................. 4.
Third ward .................... 7
Fourth ward .....:...........10
                             ————
                              23

"Total 'For the sale of intoxicating liquors' ......, ...........:..330

AGAINST THE SALE OF INTOXICATING LIQUORS.

"Upon tickets furnished by the city clerk:

First ward ....................107
Second ward .................105
Third ward ..................96
Fourth ward ................58
                           ―――
                            366

"Upon the so-called 'outside' tickets, none.

"Total 'Against the sale of intoxicat-
    ing liquors' ...............366
                              ―――
"Total vote cast ..............696

"By the action of the judges of election in reference to, said 'outside' tickets some voters who presented the same, being ten or fifteen in number in the second ward and twelve or fifteen in the third ward, at first withdrew without voting at that time. Nearly all of these returned with the tickets furnished by the city clerk. One of them, David Berg, did not return or vote. There is no proof by legal evidence that any other qualified voter failed to vote on this account. No names or numbers of qualified voters so prevented from voting are specified in the notices of contest nor of any other than the said Berg shown by the evidence.

"9. At the close of the election, all the judges and clerks signed and returned the pollbooks from the first ward; the pollbooks of the second and third wards were each signed by only two judges and two clerks, the others refusing to sign the same, and in this condition the same were returned to the said city clerk, and the pollbook of the fourth ward was signed by two judges and three clerks, the other refusing to sign same and in this condition it was returned to the city clerk. In these pollbooks the votes cast were correctly set out, counted and certified, except that the said votes upon

'outside' tickets were entered as 'illegal votes' and not entered or counted as votes in said election.

"10.  Upon receipt of said pollbooks, the said city clerk, within two days after said election, called to his assistance, one alderman from each ward in said city for the purpose of canvassing the return of said special election.   It was then learned that the said pollbooks were signed and certified as aforesaid, and for that reason, the work of canvassing said returns was postponed.  Afterwards, upon request of the said city clerk, said pollbook from the second ward was signed and certified by the other two clerks of election in that ward, two of the judges still refusing to sign; the pollbook from the third ward was signed by one more of the judges, one judge and two clerks still refusing to sign; and in this condition said pollbooks still remain.   As soon as said pollbooks were so signed, on the twentieth day of June, 1903, seven days after said election, the city clerk called to his assistance one alderman from each ward of said city for the purpose of canvassing the returns of said election, and with them canvassed and counted up the same from and in accordance with the said pollbooks, and so certified as follows:

"State of Missouri, City of Kirkwood, ss.

"I, J. G. Hawken, clerk of the city of Kirkwood, do hereby certify that I did on the twentieth day of June, 1903, call to my assistance D. H. Black, F. H. Hoch, Theo. Spinner and J. P. Schmitz, being one member of the board of aldermen of the city of Kirkwood, from each ward, for the purpose of canvassing the returns of the special election held in this city on the thirteenth day of June, 1903.

"I further certify that from the returns as certified, I found that six hundred and ninety-six votes were cast at said election, of which three hundred and seven were cast 'for the sale of intoxicating liquors,' and three hundred and sixty-six were cast 'against the sale of intoxi-

cating liquors,' and that twenty-three were counted and returned as illegal votes.

"Witness my hand and the seal of the city of Kirkwood, this twentieth day of June, A. D. 1903.

"J. G. HAWKEN, City Clerk.

[Seal of the City of Kirkwood.]

"11.   On the said twentieth day of June, 1903, said certificate of the result of said election by the city clerk was presented to the board of aldermen, and by its order spread upon the records of the board, and the said result as so certified was entered upon said records. And thereupon, on the same day, said board of aldermen enacted Ordinance No. 231 of said city, declaring the result of said election as aforesaid, and ordering the publication of a notice of said result of said election for four consecutive weeks in the said 'Weekly Courier,' in which the notice of such election had been published. In the said entry of the result of said election upon the records of said board of aldermen, and in declaring the said result in said ordinance and in the notice of said result required thereby to be published, the said result is stated as being that at said election three hundred and sixty-six votes were cast by the qualified voters of said city 'against the sale of intoxicating liquors,' and that three hundred and seven votes were cast by the qualified voters of said city 'for the sale of intoxicating liquors,' and that therefore at said election a majority of the qualified voters of the city of Kirkwood voted against the sale of intoxicating liquors in said city of Kirkwood.   The said acts of the city clerk in failing to notify the judges of election of their appointment three days before the election and to deliver to them copies of Ordinance No. 43 one day before the election, were acts of unintentional omission and without any fraudulent intent, and had no effect to prevent the said election from being lawfully and fairly conducted.   The said order of the board of aldermen requiring the city clerk to furnish the tickets to be used at said election,

and the acts of the city clerk in furnishing the same and advising that no other tickets be used at said election, and the said acts of the judges of election, in requiring the same to be used in the manner set out as aforesaid, and in announcing to voters that their tickets would be received but might be rejected as illegal and not counted, were not made or done with any fraudulent intent or purpose to prevent a fair election, or to give those on either side of the question voted upon at said election any undue advantage thereat. The natural and probable effect of such order and acts would not be to prevent a secret ballot or fair election, or to prevent qualified voters from voting. And by voting in the said manner required by the judges of election, with said tickets furnished by the city clerk, any voter was permitted to and could select a ballot upon either side of the question voted upon, as he saw fit, and cast the same secretly, and without the knowledge of other persons present. And in the same manner, the ballots of voters were less likely to be disclosed to others and less likely to be the result of intimidation and undue influence upon the minds of the voters, than if the different voters had been permitted to use tickets of such size, shape and color as they might see fit.

"The vote at said election was large in comparison with the population, the number of qualified voters and number voting at other elections in said city, the entire population of said city being about 3,350, the number of qualified voters being about 740, and the number voting at the last general election for the election of aldermen and other officers, held in April, 1903, being 553. And it is not shown by the evidence that more than one qualified voter was deterred from voting by reason of the said manner in which said special election was conducted; or that the result would have been other than a majority of votes 'against the sale of intoxicating liquors,' if the election had been lawfully conducted in any different manner.

O'Laughlin v. Kirkwood.

"The legal conclusions upon the foregoing facts are as follows: No resolution or ordinance was necessary to call said special election. The order of May 8, 1903, was sufficient for that purpose; and the notice of election in pursuance thereof was sufficient.

"The designation of voting places and appointment of judges and clerks of election, made seven days before the election, were so made by special ordinance, which was not illegal on account of being inconsistent with the general Ordinance No. 43, requiring these acts to be done at least two weeks before the election.

"The failure to notify the judges of their appointment three days before the election, is not a ground of contest specified in the notices of contest, and ought not to be considered as a ground tending to invalidate the election.

"The duty of the city clerk to furnish the pollbooks and a copy of Ordinance No. 43 to the judges of election one day prior to the election, is not an absolute one, and the failure to perform the same in the exact time specified does not of itself invalidate said election.

"The said requirement of the board of aldermen that the city clerk should furnish the tickets to be used, the said acts of the said clerk in furnishing the same and advising the exclusive use of them, and the said acts of the judges in requiring or advising that they be exclusively used and in failing to count the twenty-three ballots upon other so-called 'outside' tickets, were unauthorized by law; and said ballots upon 'outside' tickets were lawful ballots and should be counted with the other ballots in determining the result of said election. But said acts in the conduct of said election did not interfere with the right of any voter to cast a secret ballot, and did not furnish reasonable cause for any qualified voter who desired to vote at said election to decline or neglect to do so.

"The said pollbooks were lawfully and properly filled out and correctly stated the number and nature of

the ballots at said election, except that the ballots therein returned as 'illegal ballots'—twenty-three in number—should have been counted with the ballots 'for the sale of intoxicating liquors,' and the whole number of ballots 'for the sale of intoxicating liquors,' should have been stated and certified by the judges and clerks in said pollbooks as three hundred and thirty, instead of three hundred and seven. But said pollbooks as certified are not wholly void, but are sufficient with the other evidence in the case, to enable this court to determine the result of said election.

"The certificate of the result of said election by said city clerk, and the declaration of the result thereof made in the records of the board of aldermen of said city and in said Ordinance No. 231 and in the notice thereby required to be published, were incorrect in so far as they stated that the number of votes cast 'for the sale of intoxicating liquors, was three hundred and seven, but were correct in declaring as the result of said election a majority of the qualified voters of said city of Kirkwood voted 'against the sale of intoxicating liquors' in said city of Kirkwood, and for this reason the same were and are sufficient in law.

"And the court does now determine and conclude upon all the evidence, under the law, that the said special election was lawfully and fairly conducted and that at said election the votes cast by the qualified voters of said city were as follows: Three hundred and thirty votes 'for the sale of intoxicating liquors' and three hundred and sixty-six votes 'against the sale of intoxicating liquors;' and a majority of the qualified voters at said election voted 'against the sale of intoxicating liquors,' and the contestees are entitled to judgment in their favor, with costs.

(Signed)        "JOHN W. McELHINNEY,
                                                "Judge."

GOODE, J. (after stating the facts).—We care to add but little to the foregoing opinion. Apparently several points were urged in the court below against the validity of the election which are not insisted on here. The main contention of the appellants in this court is that the secrecy of the ballot was violated by the judges and clerks of the election when they notified the voters that the "outside" ballots were probably illegal; thus compelling voters either to refrain from voting or use the ballots prepared by the election officers. There is nothing in this argument; for voters were at liberty to take from the judges both forms of the regular ballot and vote the one they desired, whether it was for or against selling intoxicating liquor, without the election officers knowing which one was deposited. No citizen would have been compelled to disclose how he voted if he used one of the regular ballots. But in truth the judges did not decline to receive the outside ballots, but notified the voters they might be thrown out of the count as illegal, instead of being counted. This was simply a caution or expression of opinion by the judges, intended to apprise the voters that they took some risk in voting other ballots than the official ones.

Elections under the local option statute are to be conducted in accordance with the law governing municipal elections. R. S. 1899, sec. 3028. The central fact to be shown in an election contest, in order to annul the result, is that some mandatory statute was violated or that the election was conducted in such an illegal manner that the true sentiment of the electors was not expressed by it, or that it is impossible to know whether their true sentiment was expressed. That is to say, unless some positive mandate of the law was ignored, it must appear that the result of the election was changed by the irregular mode in which it was conducted, or that it is impossible to know, on account of irregularities or delinquencies in the conduct of the election, what the

real will of the electors was. It is palpable from the facts found by the court below that any irregularities which may have occurred in conducting this election were of a trivial character and had no tendency to prevent an honest vote, or to throw the result into confusion and doubt. The vote cast was large, and so far as was shown, no citizen was deterred from voting as he wished, nor was any fraud or unfairness exhibited by the election officers. There is no warrant whatever for saying the election did not express the sentiment of the eligible voters of Kirkwood on the question they were to decide.

The point is pressed that the election was invalid because the board of aldermen fixed the polling places and appointed the judges and clerks on June 6, 1903, one week before the election, instead of doing so two weeks before as provided by section 4 of Ordinance No. 43 in regard to general elections. That course was taken by a special Ordinance (No. 211) relating to this particular election, which the board of aldermen were at liberty to enact for the desired purpose in lieu of the general ordinance; and it did not invalidate the election unless it was plainly unreasonable or prevented a full and fair vote. The existence of a general ordinance regulating the mode of doing some municipal business does not stand in the way of the adoption of a different method by a subsequent ordinance. Strassheim v. Jerman, 56 Mo. 104. It is apparent that the appointment of the judges and clerks one week, instead of two weeks, before the election, had no bearing on the result and would be treated in any case as a directory requirement, non-compliance with which would not annul an election in the absence of proof that it worked prejudicially against ascertaining the will of the electors. Designation of polling places is most important, because that act notifies citizens where their votes can be cast. We need not decide whether the failure of the board of aldermen of Kirkwood to make such designation two

weeks prior to the election under review, as the general ordinance required, would have been fatal if no other ordinance on the subject had been enacted. The question is whether the special ordinance passed one week before the election was valid and sufficient. No statute or ordinance required the polling places to be published in the notices of the election or otherwise; and it has been decided that in the absence of a mandatory law requiring them to be published, their designation by a city council, coupled with published notices, is enough to apprise voters of when, where and for what purpose an election will be held. Chicago v. People, 80 Ill. 493, 503. The important inquiry in this connection is whether time and opportunity to ascertain the polling places were afforded the voters of Kirkwood. This inquiry is answered by the finding of the circuit judge that the vote cast was unusually large, showing that the citizens knew where to vote. That there must be reasonable notice of the holding of a special election, including the polling places, is certain; for such an election is not regulated by general law. Haddox v. Clark County, 79 Va. 677, 682; Morgan v. Gloucester, 44 N. J. L. 137; People v. Weller, 11 Cal. 49. Where no statute prescribed the length of notice, it was ruled that reasonable notice had to be given and that publishing the call for an election on the morning of the day of the election was insufficient. State v. Young, 4 Iowa 561. The same rule was declared in Commonwealth v. Smith, 132 Mass. 289, and the principle on which it rests was thus expounded:

"The main purpose of a warrant for meetings for such elections is to remind legal voters of their right and duty to vote, and of the officers to be elected, and at the same time to give them notice of the place where the election will be held, and of the hour when the polls will be open and when they will be closed. If this election at Gay Head be declared void, there can be no new election for county commissioner at Gay Head, and

the voters there will have been deprived of their votes without fault on their part, in consequence of the negligence of the selectmen of the town.

"If this negligence is such that there may not have been a full, free and fair vote, or such that the result of the election there can not be accurately ascertained, this. effect may be unavoidable; but such conclusion ought not to be reached unless the construction of the statutes clearly requires it, or the manner in which the election was called has possibly resulted in depriving some legal voter of his vote, or has influenced or rendered uncertain the result of the election; for this is an election held at the time, in the place and for the purposes prescribed by law, and by the officers authorized by law to hold such an election. The provisions of the statutes which have been disregarded in this case, we think, are not the essence of the thing required to be done, by complying with which jurisdiction or authority to hold an election was obtained; but they regulate the form and manner in which the meeting for an election required by law then and there to be held should be called."

We feel justified in view of the very large vote, in holding that Ordinance No. 211 was valid and gave the voters sufficient notice of the polling places. In a small town voters have no difficulty in learning where polling places are, unless the polls are concealed or the voters misled; and it is not asserted that either of those things was done in this instance.

The point that gave us the most difficulty, though it has not been insisted on in appellants' brief, was the refusal of some of the judges and clerks to certify the poll-books. This refusal was because certain outside ballots were not counted in casting up the result. An examination of the cases bearing on this question has convinced us that the canvassing officers were empowered to canvass the returns from those precincts and take account of them in ascertaining the total result, there being no question made against the integrity of the poll-books,

or as to whether the vote was kept in an honest way. Ex parte Heath, 3 Hill 42; Mann v. Cassidy, 1 Brewster 11; Day v. Kent, 1 Ore. 123; Clark v. McKenzie, 7 Bush. 523; Howard v. Shields, 160 Ohio St. 184; State v. Sillon, 24 Kan. 13; Patton v. Coates, 41 Ark. 111. The general result of those decisions is that when, for any reason, election officers have failed to certify the returns from a precinct and no question is made about the honesty of the election, and the vote reaches the hands of the canvassing officers, the failure of the precinct officers to certify the pollbooks or the returns, does not justify rejecting the vote of the precinct; since to do so would tend to defeat the will of the people and deprive them of their suffrage right on account of the nonfeasance of election officers.

It was held in Mayo v. Freeland, 10 Mo. 630, that in an election contest the court may examine the judges and clerks of the election and the pollbooks and correct errors in the returns, so as to determine the result in accordance with the votes cast: that is to say, may look behind the returns. By parity of reasoning the court may gather the true result by looking behind a defective return.

In Sanders v. Lacks, 142 Mo. 255, it was ruled that the fact that only four judges served at a voting precinct when the law provided for six, did not justify throwing out the vote of the precinct.

In this contest the trial court counted the outside ballots in favor of the sale of intoxicating liquors to ascertain the result of the election and it is clear that, nevertheless, the vote was against the sale of intoxicants. The petition for the special election was admittedly sufficient to justify action by the city council. The council took action by an order for an election and not by an ordinance. That mode of calling such an election was approved in State ex rel. Church v. Weeks, 38 Mo. App. 566. See also Lawson v. Railway, 30 Wis.

597; Railway v. Virden, 104 Ill. 340. Legal notice of the time of holding the election was duly published.

The judgment is affirmed. *Bland, P. J.,* and *Reyburn, J.,* concur.