STATE of Missouri ex rel. William R. "Bill" NICHOLS, Relator-Appellant,

v.

Preston S. SCHMOUTEY, Laclede County Clerk, Defendant-Respondent.

No. 8675.

Springfield Court of Appeals.

Missouri.

July 31, 1967.

Motion for Rehearing or to Transfer Denied to Supreme Court Aug. 30, 1967.

Application to Transfer Denied Oct. 9, 1967.

H. Dean Whipple, J. W. Grossenheider, Lebanon, for relator-appellant.

Low & Honssinger, Lebanon, for defendant-respondent.

L. F. COTTEY, Special Judge.

In form, this is a proceeding in mandamus; but in substance and object it is so clearly an election contest that we wonder at its being brought up in this fashion. It is an old and settled rule that mandamus cannot be employed to accomplish the purpose of an election contest. Barnes v. Gottschalk, 3 Mo.App. 111, 120; State ex rel. and to Use of Averill v. Baird, 217 Mo.App. 362, 278 S.W. 416, 417; State ex rel. Frank v. Becker, 320 Mo. 1087, 9 S.W.2d 153, 154. Worse yet, the case from any standpoint is so lacking in merit that there is no prospect the re-

view we are required to make of it can sustain reader interest.

The alternative writ issued in the court below on a petition which charged: (a) that relator was the Republican candidate for the office of county clerk of Laclede County in the 1966 general election and that respondent, the incumbent, was the Democratic candidate; (b) that a tally of the regular vote cast for the office on Election Day gave relator a majority of 126; (c) "that no additional votes have been certified to the county clerk respecting the aforesaid county clerk's election, but respondent has indicated that he will nevertheless * * * refuse to issue to relator his certificate of election"; and (d), "that the issuance thereof by the respondent is a ministerial act and that respondent has no discretion therein but must accept the certified votes which show relator to be the winner by 126 votes."

The return admitted the allegations summarized at (a) and (b) above, but denied those directly quoted at (c) and (d). It then alleged, by way of new matter, that in addition to the regular vote tallied on Election Day a total of 349 absentee and war ballots had been cast at said election, and that these, upon being counted and certified under circumstances hereafter to be detailed, gave respondent a majority of 300, thus electing him to the office by a final margin of 174; hence, that relator is not entitled to be certified as the winner.

By answer, relator attacked the validity of the absentee and war ballots and the legality of their count and certification, and to that two-pronged issue the whole thrust of the trial was directed. The evidence touching it was to this effect:

Respondent, as the incumbent county clerk, made an admittedly proper appointment of four judges, two Republicans and two Democrats whose qualifications are unquestioned, to canvass the absentee ballots. The judges met at the designated time and place for that purpose, subscribed their official oath, opened the ballots, examined the envelopes in which they had been received and the notarial certificates appended thereto without finding any irregularity or challenging a single vote, and then proceeded to count and tally the separate constitutional and judicial ballots, all in a regular manner. That done, they sorted the official ballots into three stacks for easy counting—straight Democratic, straight Republican, and split tickets—by which arrangement an unsettling fact was brought to light: the straight Democratic ballots outnumbered the straight Republican ballots by something like five to one, and the disproportion of split tickets was nearly as great. At that point the two Republican judges discovered that they could not in good conscience allow the vote to be counted. The issue would neither yield to debate nor admit of compromise. In defense of principle, then, and at some risk of martyrdom for it in the light of the various penalties prescribed for refusal to perform their duties, they "walked out."

Unfortunately, the principle they were defending is not entirely clear. Fraud in the conduct of the election was neither alleged nor shown. The qualifications of the voters had been conceded by the counting of their constitutional and judicial ballots without protest. Bernhardt v. Long, 357 Mo. 427, 209 S.W.2d 112, 116. The dissident judges did not see fit to record any objection to any ballot on any ground, as required by Sec. 112.390, V. A.M.S. And whatever discussion they may have had with their colleagues on the subject, in the absence of both parties to this action, was properly excluded by the trial court as hearsay. In this state of the record natural curiosity as to what reason the defecting officials could possibly have advanced for their decision to disfranchise the entire absent-voting electorate has led us, beyond the call of duty, to relator's offers of proof in this connection, and to his brief which makes generous use of that material, from which sources the following explanation can be pieced together.

Relator had filed his declaration of candidacy under his nickname, "Bill" Nichols. He wanted his name to appear on the ballots in that form, although no instruction to that effect was contained in the declaration and none was communicated to respondent at the time. Following publication of a sample ballot listing his candidacy under his Christian name of William R. Nichols, relator approached respondent with a request that his name be shown on the official ballots as Bill Nichols. Respondent consented, and the regular ballots were prepared in that form. But it seems the absentee ballots had already been printed and to some extent distributed at that time, and on them relator's name appeared as William R. Nichols. The Republican judges "realized" that this had "probably" happened; and when the ballots were examined and the discrepancy confirmed, the iniquitous consequence of counting them came very clearly to their minds, because, as one of them offered to testify, "it was fairly obvious that the voters didn't know how to vote for Bill Nichols since his name was not on there." Relator was prepared to confirm the extent of the voters' confusion, because "he had been told by numerous people that they do not recognize the name of William R. Nichols as Bill Nichols, and didn't even know who they were voting for."

■ Despite the fervor of these complaints, we are not persuaded that the general level of the electorate's intelligence has so lamentably deteriorated that the average elector desiring to vote for a Republican named Bill Nichols for county clerk, and being offered a choice for that office between William R. Nichols on the Republican side of the ballot and Preston Schmoutey on the Democratic side, would be unequal to the task of making a decision. Even if the question were properly before us, we would be loath to confirm so dire a suspicion on the strength of one man's opinion, notwithstanding the offer to bolster it by another's secondhand report

of rumors. Everything considered, then, we think relator's contention that the ballots were invalid must be disallowed. That brings us to his other point, which arises on these facts:

■ Following the departure of the Republican judges, the two Democratic judges counted and tallied the ballots and certified the result to respondent as county clerk, who, on the basis of it, declared himself elected. The accuracy of the count is not questioned. Relator's point is that the certification made by only two members of the canvassing board is a nullity, and that it was respondent's ministerial duty to reject it and to declare the result of the election without reference to it. In other words, the refusal of the Republican judges to perform their sworn duty rendered the board impotent to canvass and certify the absentee vote, and left respondent no alternative but to declare relator elected on the basis of the otherwise incomplete returns that favored him.

The superlative simplicity of this method of subverting an election and putting forward the losing candidate as the winner will no doubt excite admiration in some quarters. But the courts have generally taken an illiberal attitude toward such schemes. They hold to the view that "[p]opular elections involve the exercise of one of the most cherished rights of the citizen in a free government," and this right is not to be compromised by the "omissions and oversights" of the officials in charge, nor, we may confidently assume, by their deliberate malfeasance; hence the rule, that the failure of the election officials to do what the statute commands them to do "within a particular time or in a particular manner" will not frustrate the voter's right to have his ballot counted *unless* " 'the statute expressly declares [the] particular act to be essential to the validity of the election, or that its omission shall render the election void.' " Sanders v. Lacks, 142 Mo. 255, 43 S.W. 653, 654–655. The statutes pertinent to the issue before

us do not " 'expressly declare' " that a return signed and certified by *all* members of the canvassing board is " 'essential to the validity of the election, or that its omission shall render the election void.' " As a matter of fact, the cited case was one in which only four judges served at a precinct in lieu of six, the complement prescribed by the law of that day, and the court ruled that this defect, which necessarily prevented a full-board certification of the election results, "should not be held to deprive of their votes the citizens who voted at that precinct." In O'Laughlin v. City of Kirkwood, 107 Mo.App. 302, 81 S.W. 512, 518, there was a "refusal of some of the judges and clerks to certify the pollbooks," and the court held that such refusal "does not justify rejecting the vote of the precinct, since to do so would tend *to defeat the will of the people*, and deprive them of their suffrage right on account of the nonfeasance of election officers." It is pointless to extend the discussion. Relator may examine for instruction, albeit with distaste, some further examples of the courts' unsympathetic approach to his problem, to be found directly and by analogy in: Breuninger v. Hill, 277 Mo. 239, 210 S.W. 67; State ex rel. City of Memphis v. Hackman, 273 Mo. 670, 202 S.W. 7; State ex rel. Frank v. Becker, 320 Mo. 1087, 9 S.W.2d 153; State ex rel. Clark v. Smith, Mo., 15 S.W. 614; 29 C.J.S. Elections § 229, p. 642; State ex rel. Richardson v. Baldry, 331 Mo. 1006, 56 S.W.2d 67; State ex rel. and to Use of Averill v. Baird, 217 Mo.App. 362, 278 S.W. 416. In the last case, considering the evidence in this one, we may have dealt relator the most unkindest cut of all by holding that he cannot prevail "without showing that a complete canvass of the votes legally cast had been made, and that as a result of that canvass *his [election] was clearly shown*." That requirement is also made in election contest cases. Phelps v. Fenix, 345 Mo. 440, 134 S.W.2d 84, 88. Since relator could not have met it in an appropriate action, we agree with the learned trial judge that he ought not be allowed to evade it in this inappropriate one.

The judgment, quashing the alternative writ and denying a peremptory one, is affirmed.

STONE, P. J., and HOGAN and TITUS, JJ., concur.