# CHARLESTON.

### GOFF v. WILSON.

*(GREEN, JUDGE, absent.)

Submitted March 9, 1889.—Decided March 12, 1889.

ELECTIONS—GOVERNOR—MANDAMUS.

When neither the speaker of the house of delegates nor the joint assembly of both houses of the legislature convened under section 3 of article VII of the constitution of this state for the purpose of opening and publishing the returns of the election for the office of governor does in fact open and publish the returns in respect to said office or declare any person elected to that office, this Court can not by *mandamus* adjudge the person, who appears from the returns certified to the speaker of the house to have received the highest number of votes for that office, to be the governor and compel the person, who was the governor during the preceding term to deliver the office and its insignia to him.

*W. P. Hubbard, J. A. Hutchinson* and *A. Burlew* for petitioner.

---

*On account of illness.

*J. W. St. Clair, E. W. Wilson in pro per.* and *Attorney-General Alfred Caldwell* for respondent.

Snyder, President:

On March 7, 1889, Nathan Goff presented his petition to this Court, then in session, in which the petitioner avers in substance as follows: that at the general election held in this State on November 6, 1888, he was voted for and elected by the qualified voters to the office of Governor of the state for the term commencing on March 4, 1889; that the commissioners of the respective county courts ascertained the result of said election in their several counties in respect to the office of governor in the manner prescribed by law and made out and signed certificates, which they transmitted in due form of law to the Secretary of State, in sealed envelopes directed to the speaker of the house of delegates; that the Secretary of State delivered said certificates to the speaker of the house as required by law; that said certificates contained the result of said election for the auditor and other executive officers as well as for governor, and all of said county certificates were inclosed in one envelope; that the speaker of the house in the presence of a majority of each house assembled in the house of delegates for that purpose opened the envelopes containing all the said certificates and returns, and as to the aforesaid officers, other than governor, published the same, and as to the office of governor the said certificates and returns, after they had been opened as aforesaid, were delivered to a committee of the legislature appointed under the statute relating to contests for governor to report upon the same; that the said certificates and returns with respect to the office of governor showed, that for said office petitioner received at said election 78,714 votes, A. B. Fleming received 78,604 votes, and all other persons together received for said office less than 5,000 votes, thereby showing that petitioner had received a plurality of all the votes cast for said office at said election; that said A. B. Fleming had caused a notice of contest for the office of governor to be given to petitioner, and he in turn had a counter-notice given to said Fleming, both of which notices had been served and were on January 17, 1889, presented to the legislature and printed at large

upon the journal of the house of delegates, which notices as well as the journals of the senate and house of delegates, so far as the same show the action had with respect to ascertaining the result of said election and in the matter of said contest for the office of governor, are made parts of the petition; that on March 4, 1889, petitioner took the oath of office of governor in the manner prescribed by law, and on the afternoon of that day he went to the governor's office in the state capitol, where he found E. W. Wilson, who had been elected governor at the election held in 1884, and had held said office for four years ending on said 4th day of March, 1889, and still had in his possession the property and insignia of said office, and demanded of him the possession of said office and the property and insignia of, belonging, and pertaining thereto, but the said Wilson refused to surrender and deliver such possession to petitioner, and held and still holds and detains the said office, property, and insignia against the right and demand of petitioner and declares, that he will continue to do so.

Petitioner insists that he was elected to the office of governor; that neither the speaker of the house, the two houses of the Legislature, nor either of them, did or would declare him elected, but wholly failed and refused to do so, or to declare any one elected to said office; and that such failure to make such declaration can not affect his right to said office. Petitioner therefore prays for the writ of *mandamus* against said E. W. Wilson, to require him to show cause why he should not be compelled to surrender to petitioner said office, and all the property and insignia belonging thereto *etc.*

Upon the presentation of said petition the defendant, E. W. Wilson, appeared in court, and waived process, and demurred to and moved to quash said petition, which it was agreed by the parties should be treated as an alternative writ; and it was further agreed that the case should be heard upon said petition, demurrer, and motion to quash without further pleadings, and determined upon its merits, without regard to merely technical objections or questions. The case was afterwards fully argued and submitted to the court.

It appears from the journal of the house of delegates, which is made a part of the aforesaid petition, that the

following resolutions were adopted by the joint vote of the two houses of the legislature assembled in the house of delegates for the purpose of complying with section 3 of article VII of the constitution of this state, relative to the turns of the election for state officers, held November 6, 1888:

"Whereas, it appears that there is a contest as to the result of the election for governor of the state, as set forth in the petition and notice of the Hon. A. B. Fleming against the Hon. Nathan Goff, presented before this joint assembly this day, therefore be it resolved, that the publishing and declaration of the result of the vote for the said office of governor be suspended until said contest be decided in the manner prescribed by law. Resolved, that it is hereby declared as the opinion and decision of this joint assembly, that the mere reading of the returns of the election for governor, already opened, shall not be construed to give either the Hon. N. Goff or the Hon. A. B. Fleming any claim or right to the office of governor, and that all of the returns of the said election shall be referred without reading any of the returns not yet opened to the joint committee provided by the law, relating to contests for the office of governor, and be hereafter considered and have the effect as if none of the said returns had been read."

It further appears, that a joint committee of the two houses was appointed to examine and report upon the contest between Fleming and Goff for the office of governor, and all the returns and papers relating thereto were referred to said committee. It further appears upon said journal that on January 4, 1889, an order was made by the Circuit Court of Kanawha county superseding the certificate of the commissioners of the County Court of Kanawha county ascertaining the result of the election for the office of governor, held on November 6, 1888, in said county. Other facts appearing upon said journal may be hereinafter referred to, so far as they may be found material to the matters under consideration.

It is conceded, and it is unquestionably true, that, that if the petitioner is entitled to the office of governor, he may obtain it by *mandamus*. *Dew* v. *Judges*, 3 Hen. & M. 1; *Conlin* v. *Aldrich*, 98 Mass. 557; *Harwood* v. *Marshall*, 9 Md.

83; *Bridges* v. *Shallcross,* 6 W. Va. 562. The second and third sections of article VII of our constitution are as follows:

"(2) An election for governor, state superintendent of free schools, auditor, treasurer,. and attorney-general shall be held at such times and places as may be prescribed in this constitution or by general law. (3) The returns of every election for the above-named officers shall be sealed up and transmitted by the returning officers to the secretary of state, directed 'to the speaker of the house of delegates,' who shall, immediately after the organization of the house, and before proceeding to business, open and publish the same, in the presence of a majority of each house of the legislature, which shall for that purpose assemble in the hall of the house of delegates. The person having the highest number of votes for either of said offices shall be declared duly elected thereto; but, if two or more have an equal number, and the highest number of votes for the same office, the legislature shall, by joint vote, choose one of such persons for said office. Contested elections for the office of governor shall be determined by both houses of the legislature by joint vote, in such manner as may be prescribed by law."

The first section of the same article provides, that the terms of said officers "shall be four years and shall commence on the 4th day of March next after their election," and by section 7 of article IV of the same constitution it was provided that "the general elections of state and county officers and of members of the legislature shall be held on the second Tuesday of October until otherwise provided by law." The time fixed for the commencement of the sessions of the legislature is the second Wednesday of January every two years.

Under the aforesaid provision of the constitution in respect to contesting the election for the office of governor the legislature at its session in 1873 passed an act providing that, if the election of governor, treasurer, auditor *etc.* be contested, the contestant must give notice to the person whose election is contested within sixty days thereafter, and within thirty days thereafter the party, whose election is contested, shall in like manner give notice to the contestant. The par-

ties shall finish taking depositions within forty days, after the last-mentioned notice is delivered.

In case the contest is for the office of governor, the petition of the contestant and the depositions shall be referred to a joint committee of the two houses for examination and report. The contest shall be determined by the legislature, both houses thereof sitting in joint session in the hall of the house of delegates, the speaker of which house shall' preside. Sections 63, 64, c. 118, Acts 1872–73. It will thus be observed that it required at least 110 days from the date of the election to mature the contest for trial, which would still leave ample time for the trial and determination of the contest before March 4th, the time at which the governor goes into office. But by amendment of said section 7 of article IV of the constitution adopted in 1880 the time of holding the general election for governor and other state officers was changed from the second Tuesday in October to the next Tuesday after the first Monday in November, thus leaving an insufficient time intervening between the date of the election and the 4th of March to mature and determine the contest for the office of governor. Since this change in the constitution no alteration has been made by the legislature in respect to the time for maturing the trial of a contest for the office of governor, although in 1882 some slight modifications were made in the statute on that subject in other respects. Chapter 6, Code.

In this condition of the law the legislature, when it assembled in January last and found, that there was a contest pending between Gen. Goff and Judge Fleming for the office of governor, was confronted with this very grave and serious question: Was it their duty to declare either of the claimants elected to the office of governor, until after the contest could be decided? If they or the speaker of the house should at the commencement of the session, or during the term fixed by law for its continuance in regular session, declare either Goff or Fleming governor, the inevitable consequence would be, that the person so declared would have to assume the duties of the office, before it would be possible to try the contest or determine his right to the office under the existing law. The result of this might be to place in the

high and responsible office of governor and at the head of the state government a person, who had never been elected or otherwise designated by either the constitution or the law to discharge the duties of that office; for, if the trial of the contest should result in favor of the other claimant, his title would relate to the date of his election, and he would be the *de jure* governor from the commencement of the term fixed by the constitution. The decision upon the contest would be simply the determination of a fact. It would not create a fact or a right nor confer the office. The election gives the right to the office, and the decision of the tribunal fixed by law to try the contest simply declares the title upon the evidence but does not create or confer it; and if a person has the title by virtue of his election, his qualification entitles him to exercise the duties of the office. *Bier* v. *Gorrell,* 30 W. Va. 95, 100, (3 S. E. Rep. 30.) This being so, it is plain, that the person thus placed in the office before the decision of the contest would be there without any legal right. He would be a mere intruder, because he had never been elected, and was never legally entitled to the office.

It is not overlooked, that under some constitutions and systems of government it may occur and is contemplated, that a person may during a contest exercise the functions of an office, to which he has not been elected, and which he had no legal right to hold. This is conspicuously so in the cases of members of the legislature and the lower house of congress. In these cases such a result is unavoidable, because the very body, in which such person sits, is the tribunal appointed to determine the contest. But such is not the case in respect to the governor and other executive officers of this state. Our constitution provides, that the terms of all officers except the executive officers shall commence on January 1st, but, in order that the governor and other executive officers may not be called upon to exercise the duties of their respective offices, until any contest in respect thereto may be determined, the constitution wisely postpones the commencement of their terms until March 4th. It may also be conceded, that by the provision of the constitution before quoted, which provides for the opening, publishing and declaring the result of the election, it was intended, that this

declaration of the result should precede the contest, and thus give to the person having the highest number of votes, as shown by the certificates and returns, the *prima facie* title to the office and the right to the advantageous position of contestee in the subsequent contest.

But, while this may have been contemplated by the framers of the constitution, it is just as plain, that they also contemplated, that the legislature would, as it was clearly its duty to do, provide by law for the maturity and trial of a contest for any and all of said offices before the time fixed for the commencement of the term. It is scarcely possible to believe, that it was contemplated by those, who made and adopted our constitution, that we should ever have the anomaly of a person discharging the high and responsible duties of the chief executive office of the state, who had never been elected or otherwise designated by law to perform the duties of that office. The careful and guarded provisions of the constitution itself as well as its general policy forbid any such construction, unless there is no escape from it.

The joint assembly of the two houses finding itself in this serious dilemma produced not by any question as to the intent and purpose of the organic law but by a defective statute or the omission of the legislature,—whether resulting from inadvertence or other cause it is immaterial to inquire, —to provide in a proper and practicable manner and in accordance with the express power conferred upon it by the constitution for the trial and determination of a contested election for the office of governor before the commencement of the term of office, decided, as, we must assume, it believed, it had the right to do, to refer the certificates and returns for said office to a joint committee on the contest appointed in the manner prescribed by law, and to suspend the publishing and declaration of the results, until said contest should be decided. This decision and action of the joint assembly, to say the least of it, do not appear to be either unreasonable or unjust to any one under the peculiar and embarrassing circumstances of the situation before them.

But for the purposes of the case now before us it is unnecessary for us to determine, whether this action of the joint assembly was right or wrong. The real question for us

to decide are: (1) Did that assembly or any constituent part of the legislature have jurisdiction of the subject? that is, Did it have the constitutional right to determine the question? (2) If so, had it any discretion as to how it should determine the question, or the manner in which or the time, within which, it should finally decide? If these two inquiries are solved in the affirmative, then, so far as this proceeding by *mandamus* is concerned, it had the same legal power to decide wrong, that it had to decide right; for it is a principle of law too well settled to justify the citation of precedent, that, while *mandamus* may be invoked to compel the decision of a discretionary question, it cannot be used to dictate or control that decision, even when directed to the officer or tribunal having the power to determine the question; much less will a court in a collateral proceeding, such as the one before us, undertake to review or correct such decision, however erroneous it may be, or however unjust and unreasonable.

1. That either the Speaker of the House or the joint assembly (and for present purposes it is immaterial which) has jurisdiction to open and publish the returns of the election and declare the result, there can be no denial; for the right to do so is conferred by the constitution in express terms. The language employed is: "The speaker of the house of delegates shall * * * open and publish the returns in the presence" *etc.* "The person having the highest number of votes * * * shall be declared duly elected."

2. The important inquiry is, whether or not this authority, by which is given the right to open and publish the returns and declare the result, is in any way a discretionary power; that is, whether or not the power conferred is merely mechanical or purely ministerial involving no act, in which there is any legal right to exercise discretion, or make any choice as to the conclusion, which must be reached. It is hardly possible to conceive of a public office, the duties of which do not require of the officer filling it the exercise of discretion. In some instances judicial officers perform ministerial acts, and on the other hand purely ministerial officers exercise discretionary or *quasi* judicial functions. Almost every public officer, whether judicial or ministerial, must in

the discharge of his duties act in both capacities. Some of his acts will necessarily be ministerial, while others from the same necessity must be judicial or discretionary.

When a ministerial officer exercises discretionary powers, such acts are generally denominated "*quasi* judicial acts." In *Henderson* v. *Smith*, 26 W. Va. 829, this Court decided that a notary public in taking and certifying the acknowledgement and privy examination of a married woman to a deed acted in a *quasi* judicial capacity. And in *Brazie* v. *Commissioners*, 25 W. Va. 213, we decided that the county commissioners of a County Court, when assembled in special session to ascertain the result of an election, exercised *quasi* judicial functions in determining, that the ballots, poll-books and certificates of the election returns laid before them are genuine ; that they are in fact the returns, and substantially in the form prescribed by the statute. It is true, we held in that case, that prohibition would lie to prohibit the commissioners from usurping and attempting to exercise judicial functions not conferred upon them by law, but the opinion clearly shows, that the court could not interfere either by prohibition or, its correlative writ, *mandamus* with the judicial discretion of the commissioners in respect to any of the discretionary powers conferred upon them by the statute.

If the county commissioners, which is conceded to be a ministerial body, can, when sitting as a canvassing board to ascertain the result of an election, exercise discretion in determining the genuineness of the certificates of the returns laid before them, it seems to me to be equally reasonable and proper, that the joint assembly of the two houses of the Legislature, when the certificates of the returns of an election for governor or other executive officer are opened and published by it or by the speaker in its presence, should determine whether or not those certificates are genuine, and in fact the legal returns or certificates of the election. If it is the right and duty of that body to do so, then of necessity that right involves the exercise of a discretion and choice of decision. It involves the power to decide wrong as fully as it does to decide right, and in neither case can its decision be controlled or reviewed by *mandamus*.

The house journal, which is made a part of the petition in

this case, shows, that in the returns from Wood county there was a defective certificate of the vote for auditor, and in the returns from Webster county there was no certificate as to the vote for attorney-general. If the returns had been published without supplying these omissions, the result would have been different from that which it was ultimately declared to be. It does not seem, that the right of the joint assembly to supply this omission by supplementing the returns laid before it, was or could be with propriety questioned by any one.

In respect to the returns for the office of governor, the said journal shows, that the certificate for the county of Kanawha had been superseded by an order of the Circuit Court of that county upon a writ of *certiorari* to set aside said certificate and return, and that said order was still in force. It can not be denied, that said court had jurisdiction to make said order and in a proper case to set aside or correct said certificate; for this Court has expressly decided, that it had such jurisdiction. *Chenowith* v. *Commissioners*, 26 W. Va. 230; *Alderson* v. *Commissioners*, 31 W. Va. ——, (8 S. E. Rep. 274.) What was the defect in this certificate, or what returns it purported to give, we have no means of determining, but in the absence of anything showing the contrary, even if this Court could inquire into any question in respect to said returns, which is not conceded, it would be mere assumption to hold, that the joint assembly had not the legal right to question or reject at least that certificate; and, if that had been done, enough appears upon said journal to make it probable, that Fleming and not Goff would have had a majority of the votes cast in the State and would therefore probably have been declared elected governor.

It seems to me therefore, that the joint assembly sitting for the purpose of opening and publishing or seeing opened and hearing published the returns of the election for governor and other executive officers acted in a *quasi* judical capacity, at least in respect to determining the genuineness of the certificates, and that it was not bound to publish the returns or declare the result, until it had before it all the genuine returns or had exhausted all the means in its power to obtain them without success, and the Legislature having a *quasi*

judicial or discretionary authority in respect to these matters and not having finally refused to exercise that authority, this Court can not by *mandamus*, if it could do so in any proceeding, take jurisdiction either for the purpose of determining those matters for itself, or of determining the result of the election.

It is however insisted, that the demurrer to the petition admits, that the petitioner had received the highest number of votes for the office of governor, and that therefore nothing was left undone .or could have been done, by the joint assembly to entitle him to the office, except the purely ministeral act of declaring him elected; and, inasmuch as that must be the inevitable result of what had been done or what is admitted by the demurrer here, this Court will treat that ministerial act as having been done, and adjudge the office to the petitioner.

I do not think, the admission goes to the extent claimed. The petition simply avers, that the certificates and returns made out by the county commissioners, so opened and published, in fact showed, that the petitioner had the highest number of votes for the office of governor. Now as a matter of fact other parts of the petition and the journal of the house, which is made part of it, show, that only a part of the certicates for governor had been opened, and that none of them had been approved as correct or published. We must take all the allegations of the petition together, and when we do so, we find, that it is impossible, that the certificates and returns "so opened and published in fact showed that petitioner had received 78,714 votes." I think, therefore, there is no foundation for this contention.

I have thus far considered the important questions presented without reference to the fundamental principles lying at the basis of our republican system of government, and which were so learnedly and ably discussed by counsel. According to these principles the case must also be determined against the claim of the petitioner. Our constitution declares: "The legislative, executive, and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others ; nor shall any person exercise the powers of more than one of

them at the same time, except that justices of the peace shall be eligible to the legislature." Article V. Other portions of the constitution, as we have seen, not only provide, that the legislative department of the government shall open and publish the returns of the election for governor and declare the result, but confer upon that department the exclusive right to try and determine contested elections for that office.

It was admitted in the argument in this case, that the legislature must first act upon the returns of the election for governor, or at least that body or some constituent part of it is the only authority, by which the returns can be opened and published; but it is denied by the counsel for the petitioner, that, if that body refuses to declare the result of the election, such refusal will prevent the person having the highest number of votes from qualifying and exercising the duties of the office; and as a corollary of this proposition they insist, that the judiciary department has the power, in case the legislative department fails to discharge its whole duty by declaring the result of the election, to declare that result or, what is the same in effect, to adjudge the person receiving the highest number of votes for the office of governor to be in fact the governor.

It is claimed, that this right or power in the court is the result of absolute necessity; for otherwise the sacred rights of the people are at the mercy of the legislature, however corrupt or partisan may be its actions. This was a proper matter for the consideration of the framers of the constitution and of the people, when they adopted it, but when the people in their sovereign capacity declared in their constitution, that this power should be vested in the legislative department of the government, and that the judiciary should not exercise any of the powers belonging to that department, the question was settled, and the courts have no power to interfere or question its wisdom. For the grounds and reasons why the courts can not and will not undertake to determine questions such as the one here presented, I refer to the exhaustive discussion of the subject in the following decisions: *State* v. *Baxter*, 28 Ark. 129; *Baxter* v. *Brooks*, 29 Ark. 173; *Grier* v. *Shackleford*, 2 Treadw. (S. C.) 642; *Batman* v. *Megowan*, 1 Metc. (Ky.) 533; *State* v. *Marlow*, 15

Ohio St. 114; *Royce* v. *Goodwin*, 22 Mich. 496; *State* v. *Mason*, 77 Mo. 189; *State* v. *Lewis*, 51 Conn. 113; *State* v. *Harmon*, 31 Ohio St. 250; *Collin* v. *Knoblock*, 25 La. Ann. 263; *Rogers* v. *Johns*, 42 Tex. 339; *People* v. *Supervisors*, 100 Ill. 495; *Attorney General* v. *Barstow*, 4 Wis. 567; Ex parte Smith, 8 S. C. 495; *People* v. *North*, 72 N. Y. 124; *People* v. *Crissey*, 91 N. Y. 616.

I could add nothing either in argument or conclusiveness to the views expressed in the foregoing cases, and I shall therefore simply say, that according to the principles decided in those cases the declaration of the result of the election for governor under the provisions of our constitution is essential to the right to exercise the duties of that office; and, as the constitution has conferred the power to make this declaration upon the legislative department, that power is exclusive, and beyond the control or interference of the courts in any manner. To dispense with this declaration would be to nullify an express requirement of the consitution. This we are not at liberty to do. This declaration is the only record provided by the constitution to show, who is entitled to the office of governor. It is the only commission provided for him and is the only constitutional evidence of his title to the office.

For the reasons hereinbefore given I am of the opinion, that the peremptory writ of *mandamus* should be denied, and the petition dismissed.

DISMISSED.