STATE OF MISSOURI at the relation of FORREST C. DONNELL, Relator, v. MORRIS E. OSBURN, as Speaker of the House of Representatives. —147 S. W. (2d) 1065.

Court en Banc, February 19, 1941.

*Frank E. Atwood, Charles E. Rendlen* and *James A. Finch* for relator.

*Roy McKittrick,* Attorney General, *J. E. Taylor, R. L. Hyder* and *A. O'Keefe,* Assistant Attorneys General, for respondent.

DOUGLAS, J.—This is an original proceeding in mandamus against the Speaker of the House to compel him to open and publish the election returns for the office of Governor and to declare elected the person who received the highest number of votes.

The relator is the Republican candidate who, on the basis of the complete returns, was elected Governor at the General Election on November 5, 1940, by a plurality of 3613 votes.

The duty of the Speaker with reference to the returns for the chief of State offices, including Governor, is prescribed by our Constitution under the article relating to the Executive Department as follows: Article V, Section 3. "Returns of election—tie, how determined. The returns of every election for the above named officers shall be sealed up and transmitted by the returning officers to the Secretary of State, directed to the Speaker of the House of Representatives, who shall, immediately after the organization of the House, and before proceeding to other business, open and publish the same in the presence of a majority of each House of the General Assembly, who shall for that purpose assemble in the hall of the House of Representatives. The person having the highest number of votes for either of said offices shall be declared duly elected; but if two or more shall have an equal and the highest number of votes, the General Assembly shall, by joint vote, choose one of such persons for said office." Hereafter, we will refer to this provision merely as Section 3, but it must be kept in mind that it is a provision of the Constitution.

The Speaker waived the issuance of the alternative writ and agreed that relator's petition serve in its stead. He filed his return to which relator filed a demurrer. We therefore look to the facts well pleaded in the petition and the return for the facts of the case. [State ex rel. Buckley v. Thompson, 323 Mo. 248, 19 S. W. (2d) 714.]

From the pleadings we find the General Assembly convened in Jefferson City on January 8, 1941, organized, and the respondent was

elected Speaker of the House. The official election returns for the chief State offices were delivered to the Speaker and on January 10, 1941, the Senate and the House assembled together for the purpose of witnessing the opening of the returns. The returns were opened and published and those receiving the highest vote for all the State offices except for the office of Governor were declared elected. As to the office of Governor these same returns showed officially that the relator received the highest number of votes by 3613. The returns were fair on their face, there were no contradictory or conflicting returns. The Speaker declined to publish the returns and declare the election of the Governor because of the action of a majority of the Joint Assembly ordering him not to do so. Such action was based on the filing in the House and Senate of a resolution of the Democratic State Committee charging irregularities, excessive use of money and fraud in the election of Governor. The resolution asked an investigation by the General Assembly "into the vote cast for governor." In support, many Democratic county committees filed similar resolutions. There was also filed with the General Assembly by a citizen and voter of Cole County a petition likewise charging fraud in the election. It prayed that the General Assembly investigate the election, correct the returns and recount the ballots. The Joint Assembly adopted the prayer of this petition and also adopted "Joint Resolution No. 3" to carry the petition into effect. This resolution created a committee composed of members of each house and empowered it to investigate the election and to recount the ballots. It further provided that pending the investigation no declaration of election should be made by the Speaker with reference to the office of Governor.

All this occurred at the Joint Assembly on January 10. The term of office of the new Governor commenced on January 13. On that date relator filed his petition for mandamus in this court.

■ It is agreed and admitted that relator possesses the proper qualifications for the office of Governor and that the face of the returns show his election. The Speaker contends, on the other hand, that the relator did not receive the highest number of *legal votes* cast at the election. He also contends that the duty of publishing the returns and declaring the election, is imposed on the Speaker acting with the Joint Assembly and since the Joint Assembly has entertained an investigation and contest of the office of Governor no declaration may be made until the contest is tried and determined and therefore he has no power to declare the election. He attacks our jurisdiction to issue a writ against him on the grounds first, that we may not compel the performance of such a duty which he contends is enjoined on him and the Legislature and second, that as Speaker he is not such an officer as would be amenable to our writ.

There is no contention here that the relator should have pursued any other remedy. Nor do we think that any other remedy is available

to him. Almost two hundred years ago Lord Mansfield in the case of Rex v. Barker et al., 3 Burrow, 1266, announced the rule which was approved in Marbury v. Madison, 1 Cranch, 137, and is followed today. He said: "Where there is a right to execute an office, perform a service, or exercise a franchise (more especially, if it be in a matter of public concern, or attended with profit); and a person is kept out of possession, or dispossessed of such right, and has no other specific legal remedy; this court ought to assist by mandamus; upon reasons of justice, as the writ expresses . . . ., and upon reasons of public policy, to preserve peace, order and good government."

However, before we may exercise our jurisdiction to issue our writ of mandamus, the duty to be performed must be of the character which we may order performed; and the officer who should perform it must be one we may command. We may direct the performance of a public duty which the law clearly and peremptorily imposes and where there is no discretion in the officer to act or refuse.

Let us first determine the nature of the duty positively imposed upon the Speaker by Section 3. Is it a duty about which he may exercise discretion or is it merely a ministerial duty? He is first directed to *open* the returns which had been sealed and transmitted. Next he shall *publish* them. To publish means to make known; to bring before the public; to make public. A matter that is public is open to the knowledge or view of all; without privacy. Then Section 3 directs that the person having the highest number of votes shall be declared duly elected. It does not directly specify who shall make this declaration but this should cause no concern because the Legislature itself has solemnly placed its interpretation on this provision by statute (Sec. 11461, R. S. 1939), wherein it has expressly provided that such declaration shall be by the Speaker. We adopt such construction as it is a reasonable one. [State v. Riedel, 329 Mo. 616, 46 S. W. (2d) 131.] The next duty of the Speaker then, is to declare the winner. Webster defines *declare* as meaning to make a formal announcement of; to avow. These are three simple, mandatory duties about which the Speaker has no discretion. But that is not all, their performance is further limited; first as to place— in the hall of the House of Representatives; second, as to witnesses— in the presence of a majority of each house who shall assemble for that purpose; and third, as to time—immediately after the organization of the House, and before proceeding to other business.

There is an attempt to argue that the requirement of the presence of a majority of each House in Joint Assembly when the returns are opened and published must be interpreted to mean that such members exercise a discretionary role which mandamus may not control. The active participation of the Joint Assembly is called for by the constitutional provision only when there is a tie vote. By statute, it is true the General Assembly has reserved the right to

correct mistakes and has. decreed that the returns "shall be counted by the speaker, under the direction and control of the two houses thus assembled." [Sec. 11461, R. S. 1939.] Such mistakes must. of necessity be ones which are shown on the face of the returns and which may be corrected at the joint session, the same kind of mistakes that a canvassing board may correct. The duty of counting the totals shown by the returns and declaring the result remains in the Speaker. It is admitted there were no mistakes on the face of the returns so we need not discuss the legality of these statutory provisions because they do not affect this case. A more compelling reason for the presence of the members of the joint session lies' in their capacity as witnesses. It is reasonable that the returns for the important executive officers should be opened and made public by a public officer, in a public place, before witnesses. Who would be more likely witnesses than the members of the body designated to entertain and decide a contest for the two highest offices if one be later instituted? Section 3 is explicit. The Speaker "shall . . . open and publish . . . in the presence of a majority . . . who shall *for that purpose* assemble." For example, Section 11615, R. S. 1939, provides that the county clerk shall select two witnesses to the canvass of the votes but they have no duties except to act as witnesses.

The time prescribed for performing these duties also indicates that they are ministerial. "Before proceeding to other business' the question of what is shown by the returns of the election for Governor must be determined. It could not have been the intention of the people to postpone the important business of the State awaiting the outcome of a long and spirited election contest. A Governor may not succeed himself. Absent some express provision, it could not have been intended to make it possible by such a device to continue an incumbent Governor in office awaiting the determination of a contest which might be prolonged over a long period of time, especially in view of this limited single term.

█ We are convinced that the result as determined from the face of the returns was to be at least prima facie evidence of election. It follows then that the duties imposed by Section 3 are ministerial. The winner as shown thereon was to be declared elected. If the election was to be contested such contest would be thereafter instituted and conducted as provided by law. We held official returns to be prima facie evidence of election and good until proved otherwise by contest in State ex rel. Attorney General v. Vail, 53 Mo. 97.

In the debates before the Constitutional Convention of 1875 which proposed Section 3, it seems to have been agreed that upon aggregating the votes from the face of the returns the candidate with the highest vote would prima facie be entitled to the office and to enter upon his duties. Any attack upon the returns would have to be made there-

after by a contest before the General Assembly. [See Debates of the Missouri Constitutional Convention of 1875 by Loeb and Shoemaker, Vol. IV, p. 428, et seq.] We refer to the debates with knowledge of the rule which limits the reliance which may be placed in them. [State ex rel. Heimberger v. Board of Curators, 268 Mo. 598, 188 S. W. 128.]

■ The duties enjoined upon the Speaker place him in the same category as a mere canvassing officer or canvassing board. By the overwhelming weight of authority throughout the country the function and duties of canvassers are purely ministerial. [20 C. J., sec. 254, 18 Am. Jur., sec. 254.] This State follows the weight of authority. The rule here adopted is that the duty of casting up the vote certified by the returns and ascertaining who received the highest vote is a purely ministerial duty, and being such the canvassers have no right to go behind the returns. [Mayo v. Freeland, 10 Mo. 629; State ex rel. Attorney General v. Steers, 40 Mo. 223; State ex rel. Metcalf v. Garesche, 65 Mo. 480; State ex rel. Ford v. Trigg, 72 Mo. 365; State ex rel. Broadhead v. Berg, 76 Mo. 136; Barnes v. Gottschalk, 3 Mo. App. 111; State ex rel. v. Stuckey, 78 Mo. App. 533; State ex rel. Glenn v. Smith, 129 Mo. App. 49, 107 S. W. 1051; State ex inf. Anderson v. Moss, 187 Mo. App. 151, 172 S. W. 1180.] We see no reason why this is not also true of the canvass which the Speaker is required to make by Section 3.

■ Does the action of the Joint Assembly in entertaining the investigation and the alleged contest of the election change the nature of the Speaker's duties? It will be observed that there is no reference to a contest in Section 3. In an entirely different section, Section 25 of Article V, we find: "Contested elections of Governor and Lieutenant-Governor shall be decided by a joint vote of both houses of the General Assembly, in such manner as may be provided by law." A contest and investigation of an election must dig behind the returns. Therefore, it may in no way interfere or prevent the Speaker from performing any duties which have to do only with the face of the returns. Only in a lawful contest would the question of the *legality* of the votes be relevant. It is not relevant in the matter of publishing the returns and declaring the winner as shown by them. The argument of the Speaker, the Joint Assembly may go behind the face of the returns and exercise judicial powers to determine the legal votes before the winner is declared according to the face of the returns, is obviously untenable. Nor do the cases from other jurisdictions, which are relied on in support of this argument, apply here because of differences in the constitutional provisions or policies which they consider.

The Speaker leans heavily on the case of Goff v. Wilson, 32 W. Va. 393, 9 S. E. 26, which was mandamus to the incumbent Governor to surrender the office to the petitioner on the ground the latter had been

elected to that office although the Speaker and the Assembly had refused to declare his election. Such refusal was based on the pendency of a contest of such election. The court points out that under some Constitutions a person would not be deprived of his office during a contest but it held that it was the constitutional policy of that state not to permit the governor or any executive officer to exercise any official duties until the determination of a contest of the office was completed. The fact that the beginning of the terms of the executive officers was postponed beyond the date other officers were seated in order to give ample time for the trial and determination of a contest was a controlling one in determining the constitutional policy. The converse of such a situation exists in Missouri which furnishes a basis for argument to sustain a contrary policy here. The case of Dickson v. Strickland, 114 Tex. 176, 265 S. W. 1012, also discusses similar constitutional provisions. It says that ''no one can be inducted into the office of Governor without legislative determination of his election. Not only must the Legislature determine that he received the highest number of votes, but Section 3 of Article IV requires a legislative adjudication of his constitutional eligibility.'' This case is therefore readily distinguishable because of the latter provision.

In Ex parte Norris, 8 S. C. 408, the statements relied on about the meaning of the words ''to open and publish the returns'' support the Speaker's theory. However, these statements are not made by the court but they are contained in the opinion of a single judge while another judge in a separate opinion in the same case reaches a conclusion which is apparently contrary to such statements. State ex rel. Morris v. Bulkeley, 61 Conn. 287, 23 Atl. 186, is determined on a constitutional provision directly contrary to ours. That provision imposed the duty on the assembly to declare as elected the person whom they should find to be ''legally chosen.'' The court held that this contemplated a judicial inquiry so that the person declared elected by the assembly would have unimpeachable title to his office. These cases do not sustain the Speaker's contentions under the terms of our constitutional provisions.

It is our judgment that the duty commanded by Section 3 is imposed on the Speaker and is clear, peremptory and ministerial and therefore one which may be directed by mandamus.

We turn now to the final part of the question before us. Is the Speaker an officer subject to our writ or is he shielded by the cloak of the legislative branch of the government? The Speaker necessarily must be a member of the House of Representatives and is elected to the office of Speaker by the members of the House. Therefore, he argues that he is but an agent and instrumentality of the House in performing the duties placed on him by Section 3. It has been held that the Speaker is the agent or servant of the House and under its orders. But this is the case only where the House is per-

forming its usual legislative duties. And certainly there are no legislative duties involved here. Such duties have been fulfilled in enacting the laws governing the elections. Administering these duties lies with the executive branch of the government extending down to the judges and clerks of election. The statutes provide that after the vote in the precinct has been enumerated under the inspection of the judges that it shall be publicly proclaimed to the persons present. [Sec. 11613, R. S. 1939.] Then the county clerk must cast up the vote and issue certificates of election to county officers. [Sec. 11615, R. S. 1939.] For certain State officers the Secretary of State must cast up the vote and certify to the Governor the names of those having the highest number. [Sec. 11466, R. S. 1939.] In none of these instances could it be conceived, nor has it ever been held in this State, that any legislative duty or power is even remotely involved. Nor can it be contended here that the duty of the Speaker prescribed by Section 3 is of legislative character. In other words, the Speaker's canvass for the State officers directed by Section 3 is exactly the same duty as the county clerk's canvass for his county officers directed by the statute. Can it be of no significance that the Constitution has placed this duty in Article V relating to the Executive Department?

Nor does the office occupied by respondent as Speaker of the House put him beyond the jurisdiction of mandamus. In Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60, Chief Justice MARSHALL declared that "it is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus is to be determined." This court followed that rule in effect in State ex rel. Robb v. Stone, 120 Mo. 428, 25 S. W. 376. There we refused to issue mandamus against the Governor on the ground that the performance or non-performance of every duty placed upon the Governor, who has "supreme executive power," involved the exercise of executive duty and discretion with which this court could not interfere. In no way would we be interfering in this case with the legislative power conferred on the Legislature by issuing our writ since the nature of the thing to be done involves neither legislative duty nor discretion. If either were involved we could not interfere because of the constitutional separation of powers which we must and we do uphold.

Our conclusion is that the Speaker is an officer to whom we may properly direct our writ to command the performance of the ministerial duty involved.

We have pointed out above that cases cited from other jurisdictions offer no aid here because of the differences in constitutional provisions and policies. However, there is one case which is apposite because it construes constitutional provisions the same as ours. It is State ex rel. Benton v. Elder, 31 Neb. 169, 47 N. W. 710. That was a pro-

ceeding in mandamus brought by a person, claiming he was elected State Auditor according to the face of the returns, against the Speaker of the House to compel the Speaker to open and publish the returns before proceeding to other business. The Speaker answered that the election was being contested and there was evidence which tended to impeach the integrity and validity of the returns; and also that there was a resolution adopted referring the returns to a committee which was to conduct the contest so that he was powerless to publish them.

The court, in that case, first considered whether mandamus would lie against the Speaker of the House. It discussed the constitutional separation of powers but declared that such provision could not be interpreted to deny relief "where an officer of either the legislative or executive department or the judicial shall refuse to execute an imperative duty imposed by law upon the office of the incumbent, to the detriment and prejudice of a citizen, or of the public." It then announced the general rule where mandamus applies and in discussing its applicability to the Speaker said: "We know of no good reason, nor has any been suggested, why this officer, appointed to perform the ministerial duty of opening and publishing these returns, should be specially taken out of the pale of law any more than other officers. It is true that his duty is to be done in the presence of a majority of the two houses, and the result is to be declared and published, as a constitutional duty, not to be controlled by the joint convention, nor subject to be diverted from its appointed purpose by any reference or submission to a proposed committee. . . . No legislative body has the power to interpose a parliamentary contrivance in contravention of the express provisions of the constitution of the State. It alone is the law governing this question. And wisely has the constitution provided a method of contesting elections, to be kept separate and distinct from the canvass and publication of the returns. . . . The duty of the Speaker to open and canvass the returns and declare the result, whether there is any contest or not, must recur every two years, upon the election of State officers, and that duty has no relation whatever to the trial of a contested election. . . . It would seem utterly impossible to enter upon such a contest at once, while the constitution prescribes that the respondent's duty must be first performed to the exclusion of any other business."

In a concurring opinion the following statement is made: "In the answer of the respondent it is alleged in substance that a contest has been instituted against the relator and other State officers named, and that they are deferring the canvass of the votes until after the determination of such contest. This, however, is clearly in violation of the constitution. That instrument requires the parties elected on the face of the returns to be declared elected and inducted into office."

484

■ The action of the Joint Assembly directing the Speaker to make no declaration with reference to the office of Governor is contrary to the affirmative duty placed upon him by Section 3, and is void. In our government the origin of all political power is vested in and derived from the people; it is a government of laws, and not of men.

The Speaker should open and publish the election returns for the office of Governor and declare the election of the relator who is admittedly the person having the highest number of votes on the face of the returns in the manner provided in Section 3, Article V of the Constitution. For this purpose our peremptory writ should issue. It is so ordered. All concur.