### STATE ex rel. ST. JOSEPH LIGHT & POWER COMPANY, Relator,

v.

### Darrell PARKS, Mayor of Easton, Missouri et al., Respondents.

#### No. 24398.

Kansas City Court of Appeals.

Missouri.

Oct. 3, 1966.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 5, 1966.

Application to Transfer Denied Jan. 9, 1967.

Floyd M. Sprague, Charles S. Wilcox, Sprague, Wilcox & Houts, St. Joseph, for relator.

Vernon N. Kneib, St. Joseph, for respondents.

HOWARD, Judge.

Relator, St. Joseph Light and Power Company, brings mandamus against the mayor, all four aldermen and the city clerk of the City of Easton, Missouri, and against six individuals who acted as judges and clerks of a special election held in the City of Easton on August 11, 1964. By the writ of mandamus, relator seeks to change the official records of the city to show that a proposition to grant it a franchise was passed at such special election. The Circuit Court of Buchanan County, Missouri, by its final judgment limited the commands of its peremptory writ of mandamus to the city clerk, ordering her to record in the journal of the proceedings of the board of aldermen, the final passage of Ordinance 108 (granting a franchise to relator) on July 6, 1964, by a vote of three to one and declaring Ordinance 110, passed September 14, 1964 to be null and void and directing the city clerk to expunge it from the records and to enter in the journal of the proceedings of the board of aldermen that Ordinance 108 "carried by the affirmative vote of a majority of the qualified voters of the City of Easton voting at said special election of August 11, 1964."

Before the events here in question transpired, the City of Easton was a 4th class city, which owned and operated its own electrical distribution system. It purchased electric energy at wholesale from the relator, and sold it at retail to the residents of Easton, through its distribution system. For a considerable period of time, the light company had desired to terminate this arrangement and secure a franchise from the city authorizing it to sell directly at retail to the residents of the city. In the early part of 1964, Ronald Beery, an area engineer for relator, made arrangements to appear before the city council and present the light company's proposal. On two occasions he met with the city council and explained the proposal, which was that the company would purchase the city's distribution system for $6,500.00, and the contract for the sale of electric energy to the city at wholesale, as embodied in Ordinance No. 60–1, passed September 22, 1960, would be cancelled and the company would be granted a twenty year franchise to operate the distribution system and sell electric energy at retail in the city.

The mayor and members of the board of aldermen testified that they understood that this was to be one proposal to be set forth in one ordinance; that the sale of the distribution system and the granting of the franchise were interdependant and that one would not be accomplished without the other. Mr. Beery appeared at a regular city council meeting on July 6, 1964, with two ordinances, which he had prepared and which are designated herein as Ordinance No. 108 and Ordinance No. 109. He explained that Ordinance 108, providing for the franchise, required approval of the voters by only a simple majority, whereas Ordinance No. 109, providing for the sale of the distribution system, required approval by two-thirds of the voters voting thereon, and, for this reason, it was necessary to use two ordinances rather than one.

There are conflicts between the testimony of Beery, on the one hand, and the city officials, on the other, as to exactly what happened at this meeting but in the view we take of the case, they need not be set out in detail. The ordinances were thoroughly discussed and it appeared that three of the aldermen, Heinrichs, Miller and Owens favored submitting the matter to a vote of the people and alderman Coffey was opposed. Such a motion was made and seconded. Beery testified there was a vote by a show of hands with three favorable votes and Coffey not voting. The city officials testified there was no vote, but, as was usual they all knew how everyone else stood and they did decide that they

would have an election. At the close of the meeting the mayor signed both ordinances in the presence of all of the aldermen and gave them to Beery.

Mrs. Miller (the wife of Alderman Miller) was the city clerk. She was not present at this council meeting. It appears that until shortly before this meeting, the city of Easton had not kept any written journal of its proceedings as required by Section 79.150 (all statutory references are to RSMo 1959 and V.A.M.S.). Not long prior to this date, Mrs. Miller had become city clerk, and she had adopted the practice of writing up the minutes of the meetings in the journal from what her husband (Alderman Miller) told her transpired at the council meetings when he came home from such meetings. The council never read or approved the minutes of its previous meetings as shown in the journal.

After the council meeting of July 6, 1964, Mr. Beery accompanied Mr. Miller to his home, where he secured the signature of Mrs. Miller, the city clerk, on both ordinances. Beery dictated the minutes of the council meeting to Mrs. Miller, who wrote them up in the journal the next morning. Beery says the clerk requested assistance; Mrs. Miller says Beery insisted on dictating the minutes so they would be exactly right. Beery testified that the minutes, as they appeared in evidence from the journal, were as he dictated them, except they did not show the vote of the aldermen on the ordinances. Mrs. Miller insisted that the minutes appeared in the journal exactly as Beery dictated them; that he did not tell her how anyone voted. She testified that "they say" there was no call for a vote at the meeting and that is why she did not record a vote in the minutes.

On the basis of the foregoing evidence the trial court found that Ordinance 108 had been voted on and approved by the council by a vote of three to one, and made its alternative writ of mandamus peremptory commanding the city clerk to record in the journal of the board of alder-men of the city of Easton the final passage of such ordinance by a vote of "aye" by Aldermen Heinrichs, Owens and Miller and a vote of "nay" by Alderman Coffey.

An election was held in the city of Easton on August 11, 1964, pursuant to the call therefor contained in Ordinances No. 108 and No. 109. At this election there were two ballots, one for each ordinance. Voting was had in the two regular wards of the city, being the east and west wards. The west ward voted at the fire station, which was also the city hall. The judges and clerks of the election in this ward testified that when the polls closed, they left the poll book, tally sheet and all other election materials and the ballot box on the table in the fire station in the presence of and pursuant to the instructions of Alderman Coffey. The polling place for the east ward was in a private home. The mayor picked up the ballot box, poll book and tally sheet from this ward and took them to the fire station, where he placed them on the table with the material from the west ward.

It had been previously arranged that a meeting of the mayor and board of aldermen would take place at 7:30 P.M., August 11, 1964, immediately after the close of the polls, for the purpose of declaring the result of the election. Mr. Beery was present at this meeting. He testified that the mayor and all aldermen, except Heinrichs, were also present. Alderman Owens testified that he was not present at this meeting and the other city officials corroborated this.

Beery testified that at the meeting he asked the mayor for the result of the election. The mayor checked the ordinances to see which required a two-thirds majority and which only required a simple majority and then gave Beery the result of the election in both wards on both ordinances. Beery had theretofore prepared an ordinance declaring the result of the election, and he wrote the results of such election, as they were given to him by the mayor,

on the proposed Ordinance 110. Beery testified that these results as to Ordinance 108 were: in the east ward, 25 yes and 15 no, in the west ward, 32 yes and 31 no, making a total vote on Ordinance 108 of 57 yes and 46 no. He also testified that the total vote as given to him by the mayor on Ordinance 109 was: yes 60, no 43. Beery testified that the mayor had these figures on a piece of paper or tablet, but that he could not see exactly what it was. Beery asked the mayor and board of aldermen to adopt his purported Ordinance 110 declaring the result of the election on Ordinance 108 to be that the ordinance granting the franchise to the company had passed. No one would make such a motion; the aldermen saying that since Alderman Heinrichs had made the original motion they would wait until he returned from vacation to make this motion. Beery stated that the mayor told him he would not sign any legal paper, but that he would write the results of the election in long hand on a piece of paper and sign it. This offer was declined by Beery. It was then agreed that the council would meet again on August 17, 1964, when Alderman Heinrichs would be back. On August 16, 1964, Beery received a telephone call from the mayor advising him not to come to the meeting on August 17, but if he had any further business with the city, he was to contact the city's attorney. Beery testified that none of the election materials were at the fire station when he met with the city officials; that he did not see any ballots, tally sheets, poll books or ballot boxes on the table at the fire station during the meeting.

The mayor and Aldermen Miller and Coffey testified as to this meeting on the evening of August 11, 1964. The mayor testified that when he brought the election returns and supplies from the east ward, he looked at the tally sheet and both Ordinance 108 and 109 had carried in the east ward, by at least a simple majority, but that he did not know what the figures were. At the fire station he looked at the tally sheet of the west ward, but he did not know whether or not Ordinance 108 carried that ward. He stated: "I don't know. I am not going to say." He denied giving Beery the results of the election. He stated that he did not find out how the election came out and did not give any figures to Beery. He testified that he refused to sign the prepared ordinance which Beery had because he did not know what it was, but offered to get the election results and write them down on a piece of paper and sign it for Beery, but that Beery did not want this. Neither Alderman Miller nor Coffey looked at the tally sheets, nor learned, nor heard the results of the election as to either ordinance in either ward. They did not hear the mayor give the results of the election or any figures to Beery. Since they could not declare the result of the election, because of the absence of two aldermen, the meeting soon broke up and everyone left, leaving the ballot boxes, election returns and other election materials on the table in the fire house. No one locked the doors of the fire house or knew whether they were locked or not.

The ballot boxes, ballots, tally sheets, poll books and other election materials disappeared from the table in the fire station, and no one has seen them since, and all witnesses deny any knowledge of what happened to them or their present whereabouts.

The city clerk was not in town on election day. She returned home on Thursday, the 13th of August, 1964. She did not receive any ballot boxes, tally sheets, poll books or other election materials after the election. She was advised that they had disappeared from the fire station, and, since she did not know what else to do, on the 13th of August, 1964, she typed up and entered in the records of the city, a return of the election, showing no votes for either ordinance in either ward, wherein she recited, "because of sickness, the city clerk was not present on the night of the election, and now returning this Thursday morning, August 13, 1964, I find the ballots and poll

books have been misplaced and I am unable to report other than the above." No one made any search for the missing ballots and election returns and no law enforcement officers were contacted. The city officials contacted their attorney for advice.

About the 20th of August, 1964, the city officials decided to poll the electorate to determine how each person voted at the election of August 11, 1964. This poll was taken by the mayor and Aldermen Miller and Coffey going from door to door. When they had secured the signatures of 64 voters, who stated that they had voted against both Ordinance 108 and 109, they terminated the poll. Thereafter, on September 14, 1964, the city council passed Ordinance No. 110, wherein it is recited, " . . . whereas it appears from the returns of said election and canvassing of the voters of said City that the said voters of said City voted against Ordinances Nos. 108 and 109, the vote on said propositions being as attached hereto, to-wit: 64 votes "no" out of total eligible voters of 110." On this basis Ordinance No. 110 declared that Ordinances Nos. 108 and 109 "did not carry and are not adopted."

On the basis of the foregoing evidence, the trial court declared said Ordinance 110 to be null and void and of no legal effect and granted its peremptory writ of mandamus commanding the city clerk "to expunge from the minutes of the journal of the proceedings of the defendant Board of Aldermen the purported passage and approval on September 14, 1964 of purported Ordinance No. 110, and to enter into said minutes of the journal of the proceedings of said Board of Aldermen that the approval and ratification of Ordinance No. 108 carried by the affirmative vote of a majority of the qualified voters of the City of Easton voting at said special election of August 11, 1964."

Respondents have duly appealed to this court. They set forth many points for review, but in the view we take of this case, only one issue requires extended considera-

tion; that is whether or not the trial court was authorized, under the law, to issue its writ of mandamus to require the records of the city to reflect that Ordinance 108 was adopted by vote of the people, when there was, in fact, no return made of the election thereon; and if the court has such power, whether or not the evidence herein is sufficient to support its judgment.

. Section 79.030 provides that "all city elections shall be held under the provisions of Chapter 111, RSMo 1949." It also provides that "all duties specified in the state election laws to be performed by the county clerk shall be performed by the city clerk", and "[t]he manner of making returns of such elections shall be prescribed by ordinance." Pursuant to this last provision, the City of Easton had, before this controversy arose, adopted its Ordinance No. 107, which is in evidence, which provides for election returns in city elections. It reads in pertinent part, "the city clerk shall within two days after the closing of the polls in any city election, deliver to the board of aldermen a fair abstract of the votes given in their respective wards, by wards, for mayor, aldermen, city clerk and on any other office or issue submitted to vote." The state election laws set out the duties of the judges and clerks of election. Among other things it is provided in Section 111.670: "After the examination of the ballots shall be completed, the whole number of votes for each person shall be enumerated under the inspection of the judges, and set down as directed in the form of the poll books, and be publicly proclaimed to the persons present." The testimony of the judges and clerks indicates that they did, in each ward, set down the result of the election "as directed in the form of the poll books". The poll books in this instance were merely sheets of paper prepared on the typewriter by the city clerk. The poll books were signed and attested by the judges and clerks of the election, and a total was entered of the votes therein as required by Section 111.-680. Section 111.690 requires the judges of

the election to transmit one of the poll books, by a clerk, or by registered mail, to the clerk of the county court, (city clerk in this city election) within two days after the election. The statute then provides, "the other poll book shall be retained in the possession of the judges of election open to the inspection of all persons." Only one poll book was provided for this election for each ward, and there was, therefore, no duplicate poll book for the judges of the election to keep and it appears that they did not, in fact, keep any record of the vote. The election officials did not transmit the poll books to the city clerk as required by statute, but instead entrusted the poll books, together with the other election materials, to the mayor in the case of the east ward and to Alderman Coffey in case of the west ward. They never reached the city clerk. Not having any returns, she could not "deliver to the Board of Aldermen a fair abstract of the votes given" in the election.

Counsel have cited no case wherein an even vaguely similar set of facts have been considered. Our extensive research has revealed none. The situation here presented might well be described as a comedy of errors, except that it is not funny. It would be more accurate to describe it as either tragic or pathetic—perhaps both. We are dealing here with the matter of the return and canvass of the results of an election by the people. We are not dealing with the minutes of a public meeting, such as those of a city council or a school board, thus the holdings in such cases as State ex rel. Lovell v. Tinsley, 241 Mo.App. 690, 236 S.W.2d 24, and State ex rel. Marcum v. Sappington, Mo.App., 261 S.W.2d 385, are of little help. Even though the results of this city election are to be declared by the city council, we can not let this fact obscure the issue here presented which is, as stated, the return and canvass of the results of a popular election. This is not an attempt at an election contest. Consequently such cases as State ex rel. Frank v. Becker, 320 Mo. 1087, 9 S.W.2d 153; Arkansas-Missouri Power Corporation v. City of Potosi, 355 Mo. 356, 196 S.W.2d 152; State ex rel. Sisson v. Felker, Mo.App., 336 S.W.2d 419, and Felker v. City of Sikeston, Mo.App., 334 S.W.2d 754, cited by respondents, are not in point. We must determine what, if anything, can be done to declare the results of an election, when the returns thereof have disappeared and are no longer in existence, and, therefore, the canvassing officials are unable to canvass the returns and there is no canvass on which a declaration of the results of an election can be based.

Our courts have repeatedly held that the function of canvassing the returns of the election results as submitted by the judges and clerks of the election in the various voting districts, is solely ministerial in character. The canvassers can not go behind the election returns as submitted by the judges and clerks. They can not determine the legality of any particular vote, or the legality of the entire vote in any district, and can not reconcile conflicts between the tallies of the vote and the total vote as certified by the election officials, without specific statutory authority. This was early decided by our Supreme Court in an opinion by Judge Napton, in Mayo v. Freeland, 10 Mo. 629. It has been adhered to down through the years and was reiterated as late as 1941 by our Supreme Court en banc in State ex rel. Donnell v. Osburn, 347 Mo. 469, 147 S.W.2d 1065, 136 A.L.R. 667, in an opinion by Judge Douglas. See also State ex rel. Attorney General v. Steers, 44 Mo. 223; O'Laughlin v. City of Kirkwood, 107 Mo.App. 302, 81 S.W. 512, and State ex inf. Anderson ex rel. Boothe v. Moss, 187 Mo.App. 151, 172 S.W. 1180.

In State ex rel. Metcalf v. Garesche, 65 Mo. 480, the court determined that the return of the election judges and clerks had been improperly changed after such return was delivered to the city clerk. The court determined what the original return was and by mandamus required the canvassers to correctly canvass the return as originally made, before such improper change. No

case has been found where the canvassers were either permitted or required to do anything other than cast up the vote from the totals as returned by the election officials of the various voting districts. In State ex rel. Frank v. Becker, 320 Mo. 1087, 9 S.W.2d 153, our Supreme Court en banc took the unusual step of handing down a per curiam opinion explaining the reasons for its refusal to grant a preliminary writ of mandamus. In this case a candidate for the Republican nomination for United States senator sought the writ to compel the secretary of state to certify the election returns without including the returns from the counties of Jackson, Buchanan and Pemiscot, because the returns from such counties were so arbitrarily and fraudulently false as to be a nullity. The court pointed out that by statute the secretary of state is required to certify the results of a primary election as they appear from the state canvass. He can not go behind the canvass and the court will not, by mandamus, require the secretary of state to do something which he is not authorized to do by law.

■ Applying the foregoing cases to the situation at bar, it is apparent that the duties of the city clerk in making the canvass of the election here at issue, were purely ministerial in nature; that she could not go behind the totals certified by the judges and clerks in each of the two wards, and that she could not, under the law, take testimony, or base her canvass on anything other than the returns from each of the wards. Likewise, the board of aldermen could not declare the results of the election on the basis of anything other than the "fair abstract of the votes given" as furnished by the clerk. As is pointed out in 29 C.J.S. Elections § 221, page 632: "An election is not deemed to be complete until the result is determined and declared."

In the present case, the disappearance of the ballots, poll books and tally sheets leaves a void which the city clerk and the board of aldermen could not fill. The clerk could do nothing other than make the canvass as she did; because of the disappearance of the election materials, including the poll books and the returns of the election judges and clerks, she could only make a canvass of no vote. Under these circumstances the board of aldermen was powerless to declare that Ordinance 108 passed.

■ We are, therefore, of the opinion that the trial court was without power to issue its writ of mandamus requiring the city clerk to enter a declaration of the result of the election by the city council in the minutes of the proceedings of the board of aldermen. The law did not authorize the city clerk to take such action in this situation, and, as pointed out in State ex rel. Frank v. Becker, supra, the court will not command the ministerial officer to do what the law does not authorize him to do. This is not a situation where the city clerk made an erroneous report or failed to report what actually transpired, rather, this is a situation where a condition precedent to the city clerk's action, receipt of the election returns from the judges and clerks of the election, never occurred. Likewise, delivery of a fair abstract of the vote, by the city clerk to the board of aldermen, was necessary before the aldermen could declare the results of the election. Can the clerk be required to record a declaration which never, in fact, took place? We think not.

■ However, our decision does not rest on this basis alone If we should assume that the trial court did have power to issue such writ, we must next determine whether the evidence in the instant case is sufficient to support its judgment. We conclude that it is not. The only evidence as to the results of the election is the testimony of the witness Beery. He did not testify as of his own personal knowledge. In fact, he specifically denied any such knowledge. He merely testified that the mayor gave him the figures, as being the result of the election, and he testified to the figures as given by the mayor and as he recorded them. He stated

that the mayor had these figures on a piece of paper, but he did not know what that paper was. Thus the testimony of Beery is obviously hearsay, and even though properly admitted, the credibility of Beery in no way vouches for the reliability of the election results to which he testified. If we are to rely on this evidence, we must rely on the credibility of the mayor. There is no showing from whence he secured the figures which were on the piece of paper from which he read. The mayor denied ever having placed any figures on a piece of paper and denies ever having given any figures to Beery. Likewise, the other witnesses present, i. e., Aldermen Miller and Coffey, deny having heard the mayor give any figures to Beery. The mayor testified that although he looked at the election returns, he never learned what the result of the election was and he did not know it. Both aldermen, likewise, testified that they never learned the result of the election and did not know it now. Thus the testimony of the witness Beery was hearsay, several times compounded, and even if we are to believe that the mayor made the statements attributed to him by Beery, we have no way of knowing the source from which such statements were derived. The mayor denied personal knowledge. We do not know whether he read the figures, and if so, from where he read the figures, or whether he read them correctly. We do not know if some one else told him those figures, and, if so, who that person was, whether they told him the correct figures, or whether the mayor heard the figures correctly and relayed them correctly. Thus, we can not rely on the personal knowledge of the mayor, and his statements, if made, were likewise hearsay. They have no probative value. There is a serious question as to the credibility of the testimony of the mayor and the two aldermen. It is obvious that the trial judge did not believe it and he was, no doubt, justified in his conclusion. However, this disbelief of the denials of the mayor and the aldermen can not convert their testimony into affirmative substantive evidence which could support a judgment. Relator contends that respondents did not deny its allegations concerning the mayor's statements as to the results of the election and, therefore, they stand admitted. This contention is correct; however, the allegations in paragraph 9 of relator's answer to the first amended return of Mayor Parks, et al, are cast in almost exactly the same language as Beery's testimony. It is merely alleged that the mayor read the results of the election to Beery from a piece of paper the mayor held in his hand. This has no more substance and is subject to the same infirmities as Beery's testimony. It is not sufficient to support the judgment.

The judges and clerks of the election for the east ward made return to the preliminary writ that the result of the election on Ordinance 108 was 25 yes and 15 no. This return was received in evidence by the trial court and the judges and clerks did not testify to these matters. Even if we accept these figures as reliable, they only cover one of the two wards. With the exception of Arch Pool, who was one of the election judges for the west ward, the other election officials for that ward did not know the result of the election in that ward when they testified, although they probably did know shortly after the election.

Arch Pool testified that he did not know the exact vote for and against Ordinance 108 as cast in the west ward at the election. He did not remember whether more votes were for or against Ordinance 108. He did not remember if the result was close. After being reminded of a previous telephone conversation with the attorney for the relator, Mr. Pool testified that, at the time of the telephone conversation, he thought there was only one vote difference between the vote for and against Ordinance 108. He did not

recall at the time that he testified whether that was one vote for or one vote against, but gave the following testimony: "Q. It is still your opinion that there was one vote difference, one way or the other? A. That's right."

This self contradictory testimony is without probative force and in no way tends to corroborate Beery's hearsay testimony as to the result of the election. We therefore conclude that the evidence is insufficient to support any findings by the trial court as to the result of the election on Ordinance 108, or to support the judgment of the trial court in granting its peremptory writ of mandamus, requiring the city clerk to enter in the minutes of the journal of the proceedings of the board of aldermen a declaration that Ordinance 108 carried by the affirmative vote of a majority of the qualified voters of the City of Easton voting at the special election on August 11, 1964.

■ Now, what as to the other two commands of the peremptory writ of mandamus? As to Ordinance 110, which purported to be based upon the poll of the electorate taken by the mayor and two aldermen, after the election was over, such procedure is unauthorized by law and void. However, the result of the ordinance is to declare that Ordinances 108 and 109 failed to pass at the election. This is the true result because, in the absence of the election returns, it can not be found that such ordinances received a majority of the votes at the election, and, therefore, nothing can be done except declare that the ordinances failed to pass. Therefore, the issuance of a peremptory writ of mandamus in this instance would serve no useful purposes. If the present Ordinance 110 was stricken from the records nothing could be done except adopt a new ordinance showing the same result, but for a different reason. Such a futile gesture will not be required and the writ of mandamus should not be used for this purpose.

■ As to the passage of Ordinance 108 by the city council on July 6, 1964, it is apparent from the evidence that three out of the four aldermen were in favor of the ordinance; they, in fact, agreed thereto, although no formal vote by ayes and nays was taken. Again, it is our thought that the issuance of a peremptory writ of mandamus to coerce the showing of an affirmative vote on this ordinance would be a useless and empty gesture. Everyone has, throughout these events, considered that Ordinance 108 was, in fact, passed; the election called by such ordinance was, in fact, held. Such election was a nullity because it was impossible to make return thereof, when the election materials disappeared, but this can not be remedied by the writ of mandamus. Ordinance 108 has served its purpose and has expended its force. No further action can be taken pursuant thereto regardless of whether or not the vote passing such ordinance is formally entered on the minutes of the proceedings of the board of aldermen. Therefore, the writ constitutes only an empty gesture and should not go.

For the foregoing reasons the judgment of the trial court is reversed and the peremptory writ of mandamus heretofore issued is quashed.

BLAIR, J., concurs.

CROSS, P. J., not participating.